SKF USA, INC., Plaintiff–
Cross Appellant,

v.

UNITED STATES CUSTOMS AND
BORDER PROTECTION,
Defendant–Appellant,

and

United States International Trade
Commission, Defendant–
Appellant,

and

Timken U.S. Corporation,
Defendant–Appellant,

and

United States, Robert C. Bonner, Commissioner, United States Customs and Border Protection, and Daniel R. Pearson, Chairman, United States International Trade Commission, Defendants.

Nos. 2008–1005, 2008–1006,
2008–1007, 2008–1008.

United States Court of Appeals,
Federal Circuit.

Feb. 19, 2009.

Herbert C. Shelley, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-cross appellant. With him on the brief were Alice A. Kipel and Susan R. Gihring.

Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant United States Custom and Border Protection. With him on the brief was Jeanne E. Davidson, Director. Of counsel on the brief was Andrew G. Jones, Office of Assistant Chief Counsel, United States Custom and Border Protection, of Indianapolis, IN.

Patrick V. Gallagher, Jr., Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellant United States International Trade Commission. With him on the brief were

James M. Lyons, General Counsel, and Neal J. Reynolds, Assistant General Counsel for Litigation.

Douglas W. Kmiec, Pepperdine University School of Law, of Malibu, California, argued for defendant-appellant Timken U.S. Corporation. With him on the brief were Terence P. Stewart, Amy S. Dwyer, and Patrick J. McDonough, Stewart and Stewart, of Washington, DC. Of counsel were Elizabeth J. Drake and Geert M. De Prest.

Joseph W. Dorn, King & Spalding LLP, of Washington, DC, for amicus curiae American Furniture Manufacturers Committee for Legal Trade. With him on the brief was Jeffrey M. Telep.

Gilbert B. Kaplan, King & Spalding LLP, of Washington, DC, for amicus curiae Micron Technology, Inc. With him on the brief were Jeffrey M. Telep and Tina M. Shaughnessy.

Jacques P. Soileau, Soileau Law Offices, of Breaux Bridge, Louisiana, for amicus curiae Pat Huval's Restaurant & Oyster Bar, Inc., et al.

John M. Gurley, Arent Fox LLP, of Washington, DC, for amicus curiae Koyo Corporation of U.S.A. With him on the brief was Nancy Noonan.

Michael T. Shor, Arnold & Porter LLP, of Washington, DC, argued for amici curiae Giorgio Foods, Inc., and PS Chez LLP. With him on the brief for amicus curiae PS Chez Sidney LLC was William Brown, of Cordova, Tennessee, and for Giorgio Foods, Inc., was Erum Mirza, Arnold & Porter LLP, of Washington, DC.

Before LINN and DYK, Circuit Judges, and STEARNS, District Judge.*

Opinion for the court filed by Circuit Judge DYK. Dissenting opinion filed by Circuit Judge LINN.

* Honorable Richard G. Stearns, District Judge,    United States District Court for the District of

DYK, Circuit Judge.

The Continued Dumping and Subsidy Offset Act of 2000 (the "Byrd Amendment") provides for the distribution of antidumping duties collected by the United States to eligible "affected domestic producers" of the dumped goods. 19 U.S.C. § 1675c(a) (2000). An "affected domestic producer" must be "a petitioner or interested party in support of the petition with respect to which an antidumping duty order ... has been entered." *Id.* § 1675c(b)(1)(A).

In 2005 the United States International Trade Commission ("ITC") and United States Customs and Border Protection ("Customs") denied SKF USA's ("SKF's") request for Byrd Amendment distributions, on the ground that SKF was not an eligible "affected domestic producer" because it had not been a petitioner and had not supported the petition resulting in the relevant antidumping duty order. SKF challenged this determination and the constitutionality of the Byrd Amendment in the Court of International Trade on First Amendment and equal protection grounds. The Court of International Trade held that the requirement that a claimant be a petitioner or "support" an antidumping petition violated "the Equal Protection guarantees under the Fifth Amendment to the Constitution," and that the statutory language imposing this requirement was severable from the Byrd Amendment, making SKF potentially eligible to receive distributions. *SKF USA Inc. v. United States*, 451 F.Supp.2d 1355, 1366–67 (Ct. Int'l Trade 2006).

On remand, the ITC and Customs determined that under the Court of International Trade's decision, SKF was eligible for Byrd Amendment distributions of approxi-

mately $1.4 million and that SKF's claims for additional distributions (made for the first time on remand) were not timely. The Court of International Trade upheld these remand determinations. *See SKF USA Inc. v. United States*, 502 F.Supp.2d 1325, 1328, 1334 (Ct. Int'l Trade 2007). We reverse, because we conclude that the Byrd Amendment is constitutional.

## BACKGROUND

### I

The trade laws of the United States further the government's policy against the dumping of goods. The statutory definition of "dumping" is "the sale or likely sale of goods at less than fair value." 19 U.S.C. § 1677(34).

The Department of Commerce ("Commerce") calculates the "normal value" of the imported goods and compares that price with the price at which the imported goods are sold in the United States. *See id.* §§ 1677(1), 1677b(a). If the sales price is below the normal value, dumping has occurred. In turn, the ITC determines whether such dumping has "materially injured" or threatened material injury to a United States industry. *Id.* § 1673d(b)(1).

The government almost always relies on petitioners to initiate antidumping proceedings. The regulations specifically state that "[t]he Secretary [of Commerce] normally initiates antidumping ... duty investigations based on petitions filed by a domestic interested party." 19 C.F.R. § 351.202(a). A petition must satisfy certain requirements and be filed "by or on behalf of the industry." 19 U.S.C. § 1673a(c)(1)(A).[1] After the filing of a petition, Commerce sends questionnaires to foreign producers and exporters to deter-

---

Massachusetts, sitting by designation.

1. This requires that "the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product" and that "the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product

mine whether dumping has occurred. If there is a question as to the adequacy of the petition, Commerce sends questionnaires to domestic industry members as well. The ITC sends questionnaires to domestic producers, requesting production and other data in order to assist it in determining whether the dumping alleged in the petition has materially injured a domestic industry or has threatened it with material injury. At least since 1988, the ITC questionnaires have asked whether the recipient of the questionnaire supported, opposed, or took no position on the petition. Commerce and the ITC rely heavily on information gleaned from responses to their questionnaires.

If Commerce makes a final determination that "the subject merchandise is be-

ing, or is likely to be, sold in the United States at less than its fair value,"[2] and if the ITC makes a final determination that a U.S. industry has suffered or is threatened with material injury, Commerce issues an antidumping duty order. *Id.* § 1673d(a)(1), (b)(1), (c)(2); *see also* 19 C.F.R. pt. 207; 19 C.F.R. §§ 351.205(a), 351.210(a). Such an order imposes a duty "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. Such duties are collected by Customs.

The Byrd Amendment, enacted in 2000, requires that antidumping duties collected by Customs be distributed to "affected domestic producers" for "qualifying expenditures."[3] Continued Dumping and Subsi-

---

produced by that portion of the industry expressing support for or opposition to the petition." 19 U.S.C. § 1673a(c)(4)(A).

**2.** "Normal value" and "fair value" are for the most part synonymous. Commerce regulations state that " '[f]air value' is a term used during an antidumping investigation, and is an estimate of normal value." 19 C.F.R. § 351.102(b)(22).

**3.** The relevant portion of the Byrd Amendment, 19 U.S.C. § 1675c, reads:
(b) Definitions
As used in this section:
(1) Affected domestic producer
The term "affected domestic producer" means any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons) that—
(A) was a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and
(B) remains in operation.
Companies, businesses, or persons that have ceased the production of the product covered by the order or finding or who have been acquired by a company or business that is related to a company that opposed the investigation shall not be an affected domestic producer.

. . . .
(4) Qualifying expenditure
The term "qualifying expenditure" means an expenditure incurred after the issuance of the antidumping duty finding or order or countervailing duty order in any of the following categories:
(A) Manufacturing facilities.
(B) Equipment.
(C) Research and development.
(D) Personnel training.
(E) Acquisition of technology.
(F) Health care benefits to employees paid for by the employer.
(G) Pension benefits to employees paid for by the employer.
(H) Environmental equipment, training, or technology.
(I) Acquisition of raw materials and other inputs.
(J) Working capital or other funds needed to maintain production.
. . . .
(d) Parties eligible for distribution of antidumping and countervailing duties assessed
(1) List of affected domestic producers
The Commission shall forward to the Commissioner within 60 days after the effective date of this section in the case of orders or findings in effect on January 1, 1999, or thereafter, or in any other case, within 60 days after the date an antidumping or coun-

dy Offset Act of 2000, Pub.L. No. 106–387, § 1001–1003, 114 Stat. 1549, 1549A–72–75 (codified at 19 U.S.C. § 1675c (2000)), *repealed by* Deficit Reduction Act of 2005, Pub.L. 109–171, § 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006; effective October 1, 2007).[4] Under the Byrd Amendment, in order to qualify for distributions, a party must have been "a petitioner or interested party in support of the petition," and an interested party must have indicated that it supported a particular antidumping petition "by letter or through questionnaire response" to the ITC.[5] 19 U.S.C. § 1675c(b)(1)(A), (d)(1).

## II

On March 31, 1988, the Torrington Company ("Torrington"), a United States producer of antifriction bearings, filed a petition with Commerce and the ITC requesting the imposition of antidumping duties on imported antifriction bearings. *See, e.g., Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from France,* 53 Fed.Reg. 15,074 (Dep't of Commerce Apr. 27, 1988) (initiation of antidumping duty investigation). The petition alleged that imported bear-

ings were being sold or were likely to be sold at less than fair value and that these imports materially injured or threatened to materially injure a United States industry. The petition also alleged that imported bearings were being sold at dumping margins ranging from 1% to 355%. *See, e.g., Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany,* 53 Fed.Reg. 15,073 (Dep't of Commerce Apr. 27, 1988) (initiation of antidumping duty investigation); *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from Japan,* 53 Fed.Reg. 15,076 (Dep't of Commerce Apr. 27, 1988) (initiation of antidumping duty investigation). The petition was over 200 pages in length and included scores of pages of sales data collected from several countries, product descriptions and comparisons, detailed analysis of the U.S. antifriction bearing industry, and extensive proprietary financial data.

In response to the petition, Commerce and the ITC initiated antidumping duty investigations. *See, e.g., Antifriction Bearings from France,* 53 Fed.Reg. at 15,074. Commerce sent questionnaires to foreign manufacturers,[6] and to domestic

---

tervailing duty order or finding is issued, a list of petitioners and persons with respect to each order and finding and a list of persons that indicate support of the petition by letter or through questionnaire response. In those cases in which a determination of injury was not required or the Commission's records do not permit an identification of those in support of a petition, the Commission shall consult with the administering authority to determine the identity of the petitioner and those domestic parties who have entered appearances during administrative reviews conducted by the administering authority under section 1675 of this title.

**4.** The Byrd Amendment was repealed in February 2006, but the repeal was not retroactive. The repeal provisions stated that "[a]ll duties on entries of goods made and filed before October 1, 2007 . . . shall be distribut-

ed as if [the Byrd Amendment] had not been repealed." Deficit Reduction Act of 2005, Pub.L. 109–171, § 7601(b), 120 Stat. 4, 154 (Feb. 8, 2006).

**5.** The Byrd Amendment requires the ITC to prepare a "list of affected domestic producers," defined as "a list of petitioners and persons with respect to each order and finding and a list of persons that indicate support of the petition by letter or through questionnaire response." 19 U.S.C. § 1675c(d)(1).

**6.** The foreign manufacturers included, for example, SKF's affiliated companies such as SKF UK Limited in the United Kingdom and Aktiebolaget SKF in Sweden. *See, e.g., Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the United Kingdom,* 53 Fed.Reg. 45,312 (Dep't of Commerce Nov. 9, 1988) (prelim. determinations of sales at less than fair value); *Antifriction*

industry members as well "[i]n order to determine whether a major proponent of the domestic industry opposes the petition." *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from Italy,* 53 Fed.Reg. 45,361, 45,362 (Dep't of Commerce Nov. 9, 1988) (prelim. determinations of sales at less than fair value). Commerce subsequently determined that the majority of the domestic antifriction bearing industry supported the petition.[7]

Before making its final dumping determinations, Commerce also held several public hearings in February 1989, in which Torrington and other interested parties filed pre- and post-hearing briefs.[8] Each hearing examined imports from a different country. Commerce ultimately determined that imported antifriction bearings were being or were likely to be sold at less than fair value. *See, e.g., Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany,* 54 Fed.Reg. 18,992 (Dep't of Commerce May 3, 1989) (final determinations of sales at less than fair value).

As part of its own investigation of the petition's allegations, the ITC sent detailed questionnaires to domestic ball bearing producers, seeking sales, employment, financial, and other data to help the ITC determine whether the domestic antifriction bearing industry had been materially injured (or threatened with material injury) by dumping. Eventually seven domestic companies, in addition to Torrington, supported the antidumping petition. *See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers,* 73 Fed.Reg. 31,196, 31,220–21 (U.S. Customs and Border Protection May 30, 2008) (notice of intent to distribute) (listing eight companies as affected domestic producers eligible for Byrd Amendment distributions of antifriction bearing antidumping duties). The questionnaire responses of these petition supporters were hundreds of pages long, and several of the supporters prepared responses exceeding 300 pages. The supporters supplied voluminous data in response to the ITC's questionnaires, including extensive price and shipment data, product specifications, customer lists, internal company reports, descriptions of competitors, and detailed market analyses. Since it was a domestic producer, SKF also responded to the ITC's questionnaire, but stated that it opposed the antidumping petition.

During its investigation of the petition's allegations, the ITC held two proceedings. On April 21, 1988, the ITC held a conference at which "all persons who requested

---

*Bearings (Other than Tapered Roller Bearings) and Parts Thereof from Sweden,* 53 Fed.Reg. 45,319 (Dep't of Commerce Nov. 9, 1988) (prelim. determinations of sales at less than fair value).

**7.** *See, e.g., Antifriction Bearings (Other than Spherical Plain and Tapered Roller Bearings) and Parts Thereof from Italy and Spherical Plain Bearings and Parts Thereof, from Italy,* 54 Fed.Reg. 19,096, 19,097 (Dep't of Commerce May 3, 1989) (final determinations of sales at less than and not less than fair value) (determining that petitioner had standing).

**8.** *See, e.g., Antifriction Bearings (Other than Spherical Plain Bearings and Tapered Roller Bearings) and Parts Thereof from the United Kingdom and Spherical Plain Bearings Parts Thereof from the United Kingdom,* 54 Fed.Reg. 19,120, 19,121 (Dep't of Commerce May 3, 1989) (final determinations of sales at less than and not less than fair value) ("A public hearing was held on February 14, 1989."); *Antifriction Bearings (Other than Needle Roller Bearings, Spherical Plain Bearings, and Tapered Roller Bearings) and Parts Thereof from Sweden and Needle Roller Bearings and Spherical Plain Bearings, and Parts Thereof, from Sweden,* 54 Fed.Reg. 19,114 (Dep't of Commerce May 3, 1989) (final determinations of sales at less than and not less than fair value) ("A public hearing was held on February 9, 1989.").

the opportunity were permitted to appear in person or by counsel." *See* U.S. Int'l Trade Comm'n, *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom: Preliminary Determinations,* at 3, Publication 2083 (May 1988). The ITC's report indicates that Torrington, the petitioner, appeared at the conference through counsel, assisted in the investigation, and submitted a post-conference brief providing over 120 pages of arguments, rebuttal, and analysis of the issues raised at the conference. *See id.* at A–62 n. 1 ("The petitioner . . . identified about 20 specific bearing products for which it reportedly encounters significant import competition. . . . With the help of the petitioner, the [ITC] staff selected 6 of these products to request pricing data.").

The ITC subsequently made a preliminary determination that there was a "reasonable indication that an industry in the United States is materially injured by reason of imports . . . of antifriction bearings." *Id.* at 1–2. On March 30, 1989, the ITC held a public hearing in connection with its final antidumping determination, where again "all persons who requested the opportunity were permitted to appear in person or by counsel." U.S. Int'l Trade Comm'n, *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic Of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom: Final Determinations,* at 6, Publication 2185 (May 1989). Petitioner Torrington participated in this hearing by submitting pre-hearing and post-hearing briefs, as well as by providing economic testimony during the hearing on March 30, 1989. Petitioner Torrington's pre-hearing brief was over 200 pages long, and the brief proposed findings of fact and provided detailed analyses of the data pro-

vided in responses to the ITC's questionnaires. Much of the ITC's preliminary and final determination reports were devoted to analysis of petitioner Torrington's arguments. The ITC's final determination was that the "industry in the United States is materially injured by reason of imports [of antifriction bearings] . . . which have been found by the Department of Commerce to be [dumped]." *Id.* at 2.

After the ITC's final material injury determination, Commerce issued antidumping duty orders against antifriction bearings imported from several countries, including Japan. These orders covered countries where SKF's affiliated companies manufactured antifriction bearings that later were sold in the U.S. for less than fair value. SKF's affiliated companies thus were subject to duties. *See, e.g., Ball Bearings, Cylindrical Roller Bearings, and Parts Thereof from Sweden,* 54 Fed.Reg. 20,907 (Dep't of Commerce May 15, 1989) (antidumping duty orders).

### III

This case presents no questions concerning the existence of dumping, material injury, or the appropriate antidumping duty rate. Rather, the issue is the constitutionality of the Byrd Amendment. As noted earlier, the Byrd Amendment requires the duties collected under an antidumping duty order to be shared with the petitioner and other "affected domestic producers" that supported the corresponding antidumping petition. 19 U.S.C. § 1675c(a), (b)(1). The Byrd Amendment requires the ITC to prepare a list of the affected domestic producers that petitioned for or supported each existing antidumping duty order, and directs Customs to pay qualifying producers a pro rata share of the collected antidumping duties each year to

the extent of their qualifying expenditures. *See id.* § 1675c(d).[9]

On December 29, 2000, the ITC sent Customs the list of petitioners and petition supporters for each antidumping duty order in effect on January 1, 1999, as required under § 1675c(d)(1) of the Byrd Amendment. In August 2001, Customs published a notice of intent to distribute fiscal year 2001 Byrd Amendment funds that included the current list of these eligible affected domestic producers and invited them to file certifications to obtain distributions. *See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers,* 66 Fed.Reg. 40,782 (U.S. Customs and Border Protection Aug. 3, 2001). SKF did not appear on the list and did not request to be added to the list. In July 2002, Customs published a similar notice and list for distributions of fiscal year 2002 Byrd Amendment funds. *See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers,* 67 Fed.Reg. 44,722 (U.S. Customs and Border Protection July 3, 2002). SKF did not appear on or challenge this list. In July 2003, Customs published the notice and eligibility list for distributions of fiscal year 2003 Byrd Amendment funds. *See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers,* 68 Fed.Reg. 41,597 (U.S. Customs and Border Protection July 14, 2003). Again, SKF did not appear on or challenge this list.

On March 1, 2005, for the first time, SKF asked the ITC to add SKF to its list of affected domestic producers under the antidumping duty order covering antifriction bearings from Japan.[10] The ITC denied this request on April 20, 2005, explaining that the Byrd Amendment "allows for adding only those potentially eligible producers that indicated support of the petition by letter or through questionnaire response during the original investigation." J.A. 66. The list of affected domestic producers under the Byrd Amendment for fiscal year 2005 was later published in the Federal Register, and SKF was not included. *See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers,* 70 Fed.Reg. 31,566 (U.S. Customs and Border Protection June 1, 2005). On July 13, 2005, SKF submitted a certification to Customs requesting Byrd Amendment distributions for fiscal year 2005. On July 15, 2005, Customs denied SKF's request because SKF did not appear on the ITC's list of affected domestic producers.

On October 3, 2005, SKF filed a complaint in the U.S. Court of International Trade, alleging that the Byrd Amendment and the determinations by the ITC and Customs that SKF did not qualify for 2005 Byrd Amendment distributions violated the First Amendment and equal protection guarantees of the U.S. Constitution. SKF subsequently moved for summary judgment on the agency record. SKF chal-

---

**9.** Producers who did not appear on the ITC's original list of an antidumping duty order's affected domestic producers can join the list under limited circumstances, such as by acquiring a company that was on the original list or by waiving the confidentiality of their support of the original petition. *See* 19 C.F.R. § 159.61(b)(1)(i); *Cathedral Candle v. U.S. Int'l Trade Comm'n,* 400 F.3d 1352, 1358–59 (Fed.Cir.2005) (noting that producers were added to a Byrd Amendment distribution list after waiving the confidentiality of their support for the original antidumping petition).

**10.** Since that time, SKF has claimed that it is entitled to 2004 distributions. On September 29, 2006, SKF filed a complaint against Customs and the ITC in the Court of International Trade seeking 2004 Byrd Amendment distributions. Compl., Court No. 06–00328 (Ct. Int'l Trade September 29, 2004) (later consolidated into Consol. Court No. 06–00290). The government urges this claim is untimely. SKF also is seeking 2006 distributions. Compl., Court No. 07–000035 (Ct. Int'l Trade February 5, 2007).

lenged the distribution of duties collected pursuant to the antidumping orders covering ball bearings from several countries, or, in the alternative, of only the duties collected pursuant to the antidumping order covering ball bearings from Japan.

SKF argued that the Byrd Amendment violates the Constitution's equal protection guarantees because, in light of the compensatory purpose of the Byrd Amendment, there is no rational basis for distributing antidumping duties only to domestic producers who supported an antidumping petition, and excluding similarly situated domestic producers who opposed or took no position on a petition. SKF also argued that the Byrd Amendment violates the First Amendment because it discriminates based on the viewpoint expressed by the party seeking to share in the distribution of antidumping duties.

The ITC and Customs ("the government"), supported by Timken U.S. Corporation ("Timken," the successor to petitioner Torrington),[11] urged that the Byrd Amendment was constitutional under both the First Amendment and equal protection. The government asserted that the Byrd Amendment "identifies a group of beneficiaries that are entitled to compensation for unfair trade practices" and therefore had a rational basis. Def.'s Resp. to Pl.'s Mot. J. Upon Agency R. 27. The government also asserted that the Byrd Amendment did not unconstitutionally restrict speech. Timken belatedly raised a statute of limitations defense, and the Court of International Trade declined to allow Timken to amend its answer to raise this issue. *See SKF USA Inc. v. United States,* No. 05–00542 (Ct. Int'l Trade July 14, 2006) (Order).

On the merits, the Court of International Trade held that the Byrd Amendment's restriction of distributions to antidumping petition supporters violated the Constitution's equal protection guarantees, applied to the federal government through the Fifth Amendment. *See SKF USA Inc.,* 451 F.Supp.2d at 1366. The court found that because the antidumping laws are designed to benefit entire industries rather than individual companies, and because dumping similarly injures all members of a domestic industry, parties who participate in antidumping investigations are similarly situated whether they support or oppose the antidumping petition being investigated. The court could not "discern a reasonable correlation between an entity's decision to support a petition and the gravity of the entity's injury." *Id.* at 1362. Applying rational basis review, the Court of International Trade concluded that treating supporters and opposers of antidumping petitions differently was "not rationally connected to any legitimate objective" and thus that the Byrd Amendment unconstitutionally denied equal protection to SKF. *Id.* at 1362–63.

The court also held that the petition support requirement was severable from § 1675c(b)(1) of the Byrd Amendment. The effect was to replace the words "in support of the petition" with the words "in a petition" in § 1675c(b)(1)(A), and thus to define an "affected domestic producer" as "a petitioner or interested party in a petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered." *Id.* at 1365.

The Court of International Trade remanded the case to Customs and the ITC "to review their decisions denying SKF [Byrd Amendment] disbursements." *Id.* at 1367. Pursuant to the remand, Customs and the ITC determined that SKF

---

**11.** When Timken acquired Torrington in 2003, Timken became an affected domestic producer eligible to receive antifriction bearing Byrd Amendment distributions. *See SKF USA Inc.,* 451 F.Supp.2d at 1363.

was eligible to receive over $1.4 million in 2005 Byrd Amendment distributions under the antidumping duty order covering anti-friction bearings from Japan. On review of these remand determinations, SKF argued that it was entitled to additional 2005 distributions, including distributions from antidumping duty orders involving antifriction bearings imported from additional countries. The Court of International Trade held that Customs and the ITC had complied with the remand. The court also held that SKF's certifications requesting additional 2005 distributions were untimely, because 19 C.F.R. § 159.63(a) requires certifications to be filed within sixty days of Customs' notice of intent to distribute Byrd Amendment funds for a particular fiscal year, and SKF's additional certifications were filed more than a year after Customs' July 2005 notice. *See SKF USA Inc.*, 502 F.Supp.2d at 1334.

The parties timely appealed and cross-appealed to this court. The government and Timken appeal the Court of International Trade's decision that SKF is eligible to receive Byrd Amendment distributions, and SKF cross-appeals the Court of International Trade's decision that SKF did not timely file its amended certification requesting additional 2005 Byrd Amendment distributions.

## DISCUSSION

### I

■ We first address whether the Court of International Trade had jurisdiction to hear SKF's claims. "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review'...." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338 (1934)).

■ Under 28 U.S.C. § 1581(i), "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States" arising from "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" and their "administration and enforcement." However, an action under 28 U.S.C. § 2636(i) is "barred unless commenced in accordance with the rules of the court within two years after the cause of action first accrues." The government and Timken both argue that SKF's challenge was untimely but on different theories. The government asserts that SKF's cause of action accrued either in December 2000 when the ITC sent to Customs the list of affected domestic producers, or in August 2001 when Customs published the list of affected domestic producers. Timken, in contrast, contends that SKF's cause of action accrued either when the Byrd Amendment was enacted on October 28, 2000, or in August 2001 when the ITC's list of affected domestic producers was published.[12]

SKF argues that the statute of limitations defense has been waived because it

12. The parties devote considerable attention to debating whether SKF's cause of action falls under the continuing claim doctrine, which recognizes that under some circumstances a new cause of action accrues each time a periodic payment is denied, even though some antecedent event determined the right to the payment. *See, e.g., Hatter v. United States*, 203 F.3d 795, 797–98, 800 (Fed.Cir. 2000) (en banc), *aff'd in part, rev'd in part* 532 U.S. 557, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001) (holding that where pursuant to statute taxes were withheld from judicial paychecks, a separate cause of action accrued with each individual paycheck under the continuing claim doctrine); *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1455–58 (Fed.Cir.1997) (holding that a claim was untimely because the cause of action accrued when the government administrative-

was not timely raised in the Court of International Trade.[13] The ITC and Timken argue that the statute of limitations is jurisdictional rather than an affirmative defense and thus can be raised for the first time on review.

Recently in *John R. Sand & Gravel Co. v. United States*, the Supreme Court addressed 28 U.S.C. § 2501, the statute of limitations for bringing claims in the Court of Federal Claims. —— U.S. ——, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). The Supreme Court held that because § 2501 is jurisdictional, it requires "sua sponte consideration" by courts even when a party waives the issue of timeliness. *Id.* at 752. In holding § 2501 to be jurisdictional, the Supreme Court distinguished between statutes of limitations that are affirmative defenses and those that are jurisdictional, describing jurisdictional statutes of limitations as "seek[ing] not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal." *Id.* at 753.

■ We assume, but do not decide, that the statute of limitations in § 2636(i) is jurisdictional under *John R. Sand & Grav-*

*el Co.* We hold that the filing of SKF's complaint was timely in any event because the cause of action did not accrue until June 1, 2005.[14]

■ SKF's claim for Byrd Amendment distributions could accrue only when suit could be filed. "A limitations period ordinarily does not begin to run until the plaintiff has a 'complete and present cause of action.'" *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) (quoting *Rawlings v. Ray*, 312 U.S. 96, 98, 61 S.Ct. 473, 85 L.Ed. 605 (1941)) (holding that a cause of action does not accrue under a pension plan statute until the plan's trustees calculate payments and the payer then misses a scheduled payment). While SKF could have filed a facial challenge to the Byrd Amendment immediately after its enactment and could have filed suit before 2005 to challenge a pre–2005 fiscal year's distributions, here SKF could not file suit to recover fiscal year 2005 Byrd Amendment distributions until it was known whether Byrd Amendment distributions would be available.[15] When either

---

ly made an allegedly improper rent adjustment, and that later payments based on the earlier adjustment did not create separate causes of action under the continuing claim doctrine). The continuing claim cases are not, however, concerned with the question here—namely, whether a claim can accrue before the amount of the recovery can be calculated.

13. Rule 8(d) of the Rules of the Court of International Trade requires a party to raise any statute of limitations defense in its answer. *See* Ct. Int'l Trade R. 8(d) (2002) (amended November 25, 2008; effective January 1, 2009) ("In pleading to a preceding pleading, a party shall set forth affirmatively ... statute of limitations ... and any other matter constituting an avoidance or affirmative defense.").

14. While the two-year statute of limitations applies to constitutional claims for monetary

recovery, *see Stone Container Corp. v. United States*, 229 F.3d 1345, 1349–50 (Fed.Cir. 2000), we also need not decide whether the statute of limitations here applies to facial constitutional claims. Some cases have suggested that a limitations period could not apply to facial First Amendment claims. *See Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir.2004), *cert. denied* 544 U.S. 968, 125 S.Ct. 1725, 161 L.Ed.2d 615 (2005) ("We join the Fourth Circuit in expressing serious doubts that a facial challenge under the First Amendment can ever be barred by a statute of limitations." (citing *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1168 (4th Cir.1991))).

15. *See also Bianchi v. United States*, 475 F.3d 1268, 1274 (Fed.Cir.2007) (determining that a cause of action seeking royalties had accrued when the amount of royalties was calculated); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988)

the Byrd Amendment was passed in 2000 or when the list of eligible affected domestic producers was prepared or published in 2000 or 2001, it was not known whether there would be Byrd Amendment distributions available in 2005. For instance, Commerce could have reviewed and revoked the antidumping duty order, and then there would have been no collected duties to distribute. There might have been no imports of antifriction bearings in 2005 subject to the order, and thus no duties would have been collected. SKF also could not file suit to recover fiscal year 2005 Byrd Amendment distributions until SKF knew it had incurred qualifying expenditures during that fiscal year.

The earliest SKF's claim could have accrued was when Customs published its notice of intent to distribute duties under Byrd Amendment for fiscal year 2005 and invited potentially eligible producers to file certifications requesting a share of the distributions. This notice, including the ITC's list of affected domestic producers potentially eligible to receive such distributions, was published in the Federal Register on June 1, 2005. *See Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers*, 70 Fed.Reg. 31,566 (June 1, 2005). SKF filed its complaint on October 3, 2005, well within the two-year statute of limitations under § 2636(i). Thus the Court of International Trade's jurisdiction over SKF's claims was not time-barred.

## II

■ We have jurisdiction under 28 U.S.C. § 1295(a)(5), and our review of statutory and constitutional issues is de novo. *See U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1381 (Fed.Cir.2002).

■ Although the Court of International Trade did not reach SKF's First Amendment claims, on appeal SKF urges its First Amendment theory as its primary ground for affirming the Court of International Trade's judgment.[16] We first consider that question, recognizing in that connection our well established obligation to construe statutes to avoid constitutional difficulties.[17] In performing this obligation, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (quoting *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895)). Indeed, courts are obligated to adopt a saving con-

("It is generally stated that a claim 'first accrues' when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." (citing *Japanese War Notes Claimants Assoc. of the Phil., Inc. v. United States*, 178 Ct.Cl. 630, 373 F.2d 356, 358 (1967), *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967))).

16. We also note that another decision of the Court of International Trade held that the support requirement of the Byrd Amendment violates the First Amendment. *See PS Chez Sidney, LLC v. U.S. Int'l Trade Comm'n*, 442 F.Supp.2d 1329, 1358–59 (Ct. Int'l Trade 2006). Appeals to our court from that decision have been stayed pending the outcome of this case.

17. *See United States ex rel. Attorney Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."); *see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

struction even when the interpretation finds little support in the literal language of the statute.[18] While we need not go so far to sustain the statute here, contrary to the dissent, the doctrine of constitutional avoidance is not "irrelevant," Dissenting Op. at 1368, but lies at the heart of our obligation as a reviewing court.

In addressing the constitutionality of the Byrd Amendment, it is also important to keep in mind that the statute does not prohibit particular speech. Statutes that are prohibitory in nature are rarely sustained, and cases addressing the constitutionality of such statutes are of little assistance in determining the constitutionality of the far more limited provisions of the Byrd Amendment.

■ In considering limited provisions that do not ban speech entirely, the purpose of the statute is important. As the Supreme Court noted in *Ward v. Rock Against Racism*, in many contexts "[t]he

government's purpose is the controlling consideration." 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). This is not to suggest that a benign purpose will necessarily save a statute,[19] but a suppressive purpose may render it unconstitutional. Moreover, the legitimacy of a statute's purpose is important in a First Amendment analysis whether the appropriate test is strict scrutiny (requiring a determination of the state's compelling interest) or some lesser form of scrutiny (requiring a determination of the state's substantial interest).[20] Thus, purpose is a critical question, and we must first determine the purpose of the Byrd Amendment.

The government contends that the Byrd Amendment was designed to compensate domestic producers injured by dumping. That is correct.[21] The problem here is that that appears not to be the Byrd Amendment's *only* purpose. As the Court of International Trade correctly noted, the

**18.** For example, in *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), the Supreme Court construed the Protection of Children Against Sexual Exploitation Act of 1977 to require scienter regarding the age of performers, despite the lack of support for this construction given by a grammatical reading of the statute, in order to avoid "serious constitutional doubts." *Id.* at 78, 115 S.Ct. 464. In *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533, (1979), the Supreme Court avoided constitutional questions by construing the National Labor Relations Act not to confer Board jurisdiction over teachers in church-operated schools, in light of "the absence of a clear expression of Congress' intent" to do so, *id.* at 507, 99 S.Ct. 1313, and despite the "[a]dmittedly ... very broad terms" of the statute, *id.* at 504, 99 S.Ct. 1313. Also, in *International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) the Court construed the Railway Labor Act as not giving unions the power to use a member's dues to support political causes over the member's objection, in order to "avoid serious doubt" about the statute's constitutionality, without

any basis in the statute's text. *Id.* at 749, 768–69, 81 S.Ct. 1784.

**19.** *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) ("[O]ur cases have consistently held that illicit legislative intent is not the *sine qua non* of a violation of the First Amendment." (internal quotation marks omitted)).

**20.** *See, e.g., Simon & Schuster*, 502 U.S. at 118–19, 123, 112 S.Ct. 501 (addressing compelling interests).

**21.** *See Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1380 (Fed.Cir. 2003) (noting that under the Byrd Amendment antidumping duties "bear less resemblance to a fine payable to the government, and look more like compensation to victims of anticompetitive behaviors"); 146 Cong. Rec. 23,117 (2000) (statement of Sen. Byrd) (describing the Byrd Amendment as designed in part for "compensation to U.S. industries" and providing a way for U.S. industries "to recover monetarily" from "losses sustained as a result of unfair foreign trade practices").

statute did not compensate all injured domestic producers, but only those who filed an antidumping petition and those who supported it. *See SKF USA Inc.*, 451 F.Supp.2d at 1361–62.

The government disagrees, arguing that the statute's only purpose was to compensate those who are injured by dumping, and that the statute simply used petition support as a surrogate for injury. In other words, the government argues that the sole purpose of the Byrd Amendment's support requirement was to identify those producers suffering the greatest injury, asserting that the Byrd Amendment distributions are "not based upon the viewpoint expressed" in antidumping proceedings. Resp./Reply Br. of Def.-Appellant U.S. Customs & Border Protection at 15, 20. We find this suggestion simply implausible in light of the statute's explicit restriction that only "a petitioner or interested party in support of the petition," 19 U.S.C. § 1675c(1)(A), may receive Byrd Amendment distributions, the absence of any evidence in the legislative history that the support requirement was designed as a proxy for injury, and the availability of far more direct and accurate methods of measuring injury.[22]

We turn then to the question of whether this subsidiary purpose renders the statute unconstitutional under the First Amendment.

SKF's theory is that the Byrd Amendment's restriction of distributions to antidumping petition supporters is impermissibly designed to penalize those who oppose antidumping petitions. SKF asserts that the Byrd Amendment "plainly discriminates among participants in an antidumping investigation on the basis of viewpoint by granting a financial benefit only to those domestic producers who publicly indicated support for a particular investigation." Br. Pl.-Cross Appellant SKF USA Inc. 40 (internal quotation marks omitted). SKF argues that the Byrd Amendment violates the First Amendment because "a manufacturer who opposes an investigation is penalized ... for expressing its views on the matter." *Id.* As the dissent points out, Dissenting Op. at 1364, if this were the purpose of the Byrd Amendment, it might well render the statute unconstitutional under Supreme Court cases such as *Speiser v. Randall*, 357 U.S. 513, 529, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 832, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), and *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001), each of which held unconstitutional the distribution of a government benefit designed to favor the speech preferred by the government.

■ However, this construction of the statute is not compelled or even supported by the available evidence. Neither the background of the statute, nor its articulated purpose, nor the sparse legislative history supports a conclusion that the purpose of the Byrd Amendment was to suppress expression.[23] Parties who are

---

**22.** Indeed, the ITC itself determines that parties may suffer material injury even though they have not supported a petition. *See U.S. Int'l Trade Comm'n, Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom (Review)*, at 46, Publication 3309 (June 2000) ("The level or extent of industry support for continuation of an [antidumping] order alone cannot be dispositive, for we ... are required to assess independent-

ly whether revocation [of the order] is likely to result in the continuation or recurrence of material injury.").

**23.** There is nothing in the legislative history of the Byrd Amendment to suggest that its purpose was to suppress expression. The legislative history addresses the primary purpose of the Byrd Amendment, to compensate injured parties. *See* 146 Cong. Rec. 23,117 (2000) (statement of Sen. Byrd) (referring to

awarded antidumping distributions under the Byrd Amendment may say whatever they want about the government's trade policies generally or about the particular antidumping investigation, provided they do so outside the context of the proceeding itself. Even within the proceeding, the Byrd Amendment does not prohibit opposing views but merely promotes the efforts of those who support enforcement.

An alternative construction also exists that is both more consistent with the available evidence of legislative intent and may save the statute. Under this construction, the purpose of the Byrd Amendment's limitation of eligible recipients was to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings. This interpretation is not only consistent with the statutory language but also is supported by the stated purpose to strengthen enforcement of the trade laws. Congressional findings supporting the Byrd Amendment state that "United States unfair trade laws have as their purpose the restoration of conditions of fair trade" and that "injurious dumping is to be condemned." Pub.L. No. 106–387, § 1002, 114 Stat. at 1549A–72; *see also* 146 Cong. Rec. 23,117 (2000) (statement of Sen. Byrd) (describing the Byrd Amendment as necessary to "deter unfair trade practices"). These findings also state that "continued dumping . . . after the issuance of antidumping orders . . . can frustrate the remedial purpose of the laws" to the detriment of "domestic producers . . .

small businesses and American farmers and ranchers" and that the "United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved." Pub.L. No. 106–387, § 1002, 114 Stat. at 1549A–72–73.

The dissent rejects this interpretation, relying primarily on the government's representations at oral argument that the Byrd Amendment is not designed to reward those who assist in enforcement. Dissenting Op. at 1365–66. We disagree. First, the government's views that the Byrd Amendment was not designed to reward parties assisting the government is part and parcel of the government's unsuccessful effort in this litigation (at odds even with the government's position before the World Trade Organization)[24] to suggest that the Byrd Amendment compensation scheme is only designed to compensate affected parties, a position which both the majority and the dissent reject.

■ Second, the views of the government as litigator are simply not binding on the issue of Congressional intent. Indeed, the Supreme Court has repeatedly rejected the government's litigation views in construing Congressional statutes. *See, e.g., Cherokee Nation of Okla. v. Leavitt,* 543 U.S. 631, 646–47, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005) (recognizing and then rejecting the government's interpretation of a statute); *United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 223–24, 116 S.Ct. 2106, 135

"our injured domestic industries" and describing the Byrd Amendment as designed in part to "help injured U.S. industries recover").

24. *See* Panel Report, *United States—Continued Dumping and Subsidy Offset Act of 2000,* ¶ 4.502, WT/DS217/R, WT/DS234/R (Sept. 16, 2002), *available at* http://www.wto.org/english/tratop_e/dispu_e/217_234r_a_e.pdf

(stating as the United States position in a World Trade Organization proceeding that the Byrd Amendment "has nothing to do with the administration of the anti-dumping and countervailing duty laws" and that "[t]he amount of the [Byrd Amendment] distributions have [sic] nothing to do with the injury to the domestic producer or the recovery of 'damages' by the domestic producer").

L.Ed.2d 506 (1996) (rejecting the government's interpretation of a tax statute).

Third, the government, while rejecting the reward construction, does not remotely support the dissent's suppression construction.

Fourth, and most importantly, the government's arguments cannot relieve us of our obligation to construe the Byrd Amendment to avoid a finding of unconstitutionality. This obligation extends to the ascertainment of a statute's purpose. Thus, for example, in *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836 (1909), the Supreme Court rejected the government's interpretation of the statutory purpose, concluding that if the Court adopted the government's view of the "result intended to be accomplished" by the statute, the Court would need to address several "grave constitutional questions." 213 U.S. at 404–05, 406 (1909). The Court upheld the statute by adopting a view of the purpose of the statute different from that of the government, noting that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Id.* at 408, 412. So too, in *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court upheld an immigration statute's civil detention provisions by interpreting them to be limited in scope in order to avoid "a serious constitutional problem." *Id.* at 690, 121 S.Ct. 2491. The Court concluded that there was no "clear indication of congressional intent" that the statute had only the purposes asserted by the government. *Id.* at 697, 121 S.Ct. 2491. Here too, as we have discussed, the reward construction of the Byrd Amendment is reasonable.[25]

Finally, if we were to view this case as involving the construction of statutory language rather than an exercise in ascertaining statutory purpose, the result would be the same. The language of the Byrd Amendment is easily susceptible to a construction that rewards actions (litigation support) rather than the expression of particular views. Indeed, in some respects a limiting construction of the statute is necessary to cabin its scope so that it does not reward a mere abstract expression of support.[26] The Supreme Court has frequently

---

**25.** Relying on *Thompson v. Western States Medical Center,* 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002), the dissent suggests that only interests asserted by the government in litigation may be considered. Dissenting Op. at 1368–69. *Western States* stands for no such proposition. There the statute was on its face designed to (and did) prohibit speech. The Court declined to consider a justification for the prohibition that was not supported by the legislative history or the government in argument. *See Western States,* 535 U.S. at 373–74, 122 S.Ct. 1497. Here there is no prohibition, and in addressing the constitutional question we are left to choose between two constructions, neither of which is urged by the government: a purpose to suppress expression, or a purpose to reward assistance. Nothing in *Western States* remotely suggests that we can or should adopt the construction that renders the statute unconstitutional and that is less likely in light of the statute's history.

**26.** Thus, we construe the Byrd Amendment's language providing for payments to a "petitioner or interested party in support of the petition" to only permit distributions to those who actively supported the petition (i.e., a party that did no more than submit a bare statement that it was a supporter without answering questionnaires or otherwise actively participating would not receive distributions). In other words, we agree with the Court of International Trade to the extent that it construed the Byrd Amendment to permit distributions to those who "participated." *SKF USA Inc.,* 451 F.Supp.2d at 1365. Each of the supporters in this case responded to an ITC questionnaire and thus participated actively in the proceeding.

adopted limiting constructions of statutory language not suggested by the government. For example, the Court in *DeBartolo* adopted a limiting construction of a provision of the National Labor Relations Act despite the broad construction urged by the Board. *See DeBartolo*, 485 U.S. at 575, 108 S.Ct. 1392; *see also United States v. Int'l Bus. Machs. Corp.*, 517 U.S. 843, 868, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) (Kennedy, J., dissenting) ("We have not considered ourselves foreclosed from adopting saving constructions the parties failed to suggest.").

We proceed to consider whether the reward construction would make the statute constitutional. To be sure, the reward construction does not render the First Amendment irrelevant. The Supreme Court has held that the First Amendment right to petition includes the right to petition the courts (and administrative agencies) for relief, so long as the petition is not objectively baseless. Thus, in *BE & K Construction Co. v. NLRB*, the Court held that the National Labor Relations Board could not impose liability on an employer for litigating an unsuccessful lawsuit against a union where the lawsuit was not objectively baseless, because such litigation was protected by the First Amendment. 536 U.S. 516, 529–30, 536–37, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002). In *Professional Real Estate Investors, Inc., v. Columbia Pictures Industries, Inc.*, the Court held that the First Amendment barred the imposition of antitrust liability for commencing litigation that was not objectively baseless. 508 U.S. 49, 51, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); *see also Cal. Motor Transp. Co. v. Trucking*

*Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642, (1972) (recognizing that the First Amendment right to petition extends to petitioning "administrative agencies . . . and to courts").

■■■■■■■ Under that line of cases, we have little doubt that SKF's opposition to the antidumping petition here is protected First Amendment activity.[27] But as the Supreme Court has made explicitly clear, its holding in *BE & K Construction* that litigation enjoys First Amendment protection does not suggest that it is unconstitutional to reward prevailing parties. The Court stated that "nothing in our holding today should be read to question . . . the validity of statutory provisions that merely authorize the imposition of attorney's fees on a losing plaintiff." *BE & K Constr.*, 536 U.S. at 537, 122 S.Ct. 2390. Nor do the Supreme Court's cases suggest that an award of a portion of the government's recovery to a party assisting enforcement (while not rewarding those who oppose enforcement) would be unconstitutional. In other words, the First Amendment, at least in some circumstances, does not bar rewarding parties who assist the government in litigation, even if such rewards disadvantage a losing party that asserted an unsuccessful defense that is not objectively baseless.

At the same time, the Supreme Court's right to petition cases do not establish a standard for determining when such rewards would be permissible and when, if ever, they would be forbidden by the First Amendment. We think that rewarding those who support government enforcement is at least constitutional if those pro-

---

27. *See, e.g., Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1377 (Fed.Cir.2004) (applying *Professional Real Estate Investors* to state-law tort claims and noting that "[a] plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless"); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed.Cir.1998) ("[S]ham litigation requires more than a failed legal theory." (citing *Prof'l Real Estate Investors*, 508 U.S. at 60–61 & n. 5, 113 S.Ct. 1920)).

visions satisfy the standards governing commercial speech. While the commercial speech doctrine typically applies to speech proposing a commercial transaction, it has been applied as well to regulation of other activities of a commercial nature. *See, e.g., IMS Health Inc. v. Ayotte*, 550 F.3d 42, 54–55 (1st Cir.2008) (upholding a statute regulating the data mining of physician prescription histories as commercial speech). In *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York* itself, the Supreme Court broadly defined "commercial speech" as "expression related solely to the economic interests of the speaker and its audience." 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Rewarding parties under the circumstances here is similar to commercially contracting with them to assist in the performance of a government function, in this particular context assisting in the enforcement of government policy in litigation. The well established *Central Hudson* test seems appropriate.[28] *See Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343.

Under *Central Hudson*, regulation of lawful and non-misleading commercial speech is permissible if (1) "the asserted governmental interest is substantial," (2) "the regulation directly advances the governmental interest asserted," and (3) the regulation "is not more extensive than is necessary to serve that interest." *Id.* The Byrd Amendment satisfies this test,

even if we view the Byrd Amendment as regulatory in nature.[29]

First, preventing dumping is a substantial government interest. Congress has broad powers under the Constitution to regulate trade. *See* U.S. Const., Art. I, § 8, cl. 3; *see also Bd. of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48, 56, 53 S.Ct. 509, 77 L.Ed. 1025 (1933) (Congress has "plenary" power to regulate foreign commerce); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 193, 6 L.Ed. 23 (1824). In addition, "[s]o long as legislation does not infringe on other constitutionally protected rights, Congress has wide latitude to set spending priorities." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (citing *Regan v. Taxation with Representation*, 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)). No party here questions the authority of the government to ban dumping or to spend money to enforce the antidumping laws.

Second, the Byrd Amendment directly advances the government's substantial interest in trade law enforcement by rewarding parties who assist in this enforcement. The government has a substantial interest in rewarding those who assist in the enforcement of government policy. We are not aware of any Supreme Court case that rejects the legitimacy of such rewards. Indeed, given its limited resources, it is now common for the government to reward those who assist in enforcing government policies through litigation

---

**28.** Even if we apply the test for speech combined with conduct in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), for reasons that are clear from the text the Byrd Amendment would still be constitutional.

**29.** There is a serious question as to whether the Byrd Amendment should be treated as regulatory at all, since it merely rewards suc-

cessful applicants. Alternatively, it might also be possible to view the Byrd Amendment as legitimately promoting the government's viewpoint. *See Rust v. Sullivan*, 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Regan v. Taxation with Representation*, 461 U.S. 540, 546, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). We need not reach that question here.

or administrative proceedings. Such rewards may take a variety of forms. For example, qui tam actions reward private parties for successfully bringing suit on behalf of the government.[30] Such rewards have a long history. *See Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 776–77, and nn. 5–7, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (describing the history of qui tam and informer statutes in England and the United States). Other statutes do not authorize private parties to commence the actions but allow the private parties a portion of the government's recovery or otherwise reward the private parties' assistance to the government. *See* 26 U.S.C. § 7623 (awarding a portion of the collected proceeds to whistleblowers who assist the Internal Revenue Service in detecting tax underpayments); 19 U.S.C. § 1619 (allowing compensation of informers who help enforce the customs laws). The government also rewards parties who vindicate government policy through the award of attorney's fees to successful plaintiffs, for example, in actions under Title VII of the Civil Rights Act of 1964 and other statutes.[31]

The government's authority to reward those who assist in enforcement is generally unquestioned, and as discussed above, the Supreme Court's decision in *BE & K Construction* appears to conclude that such awards are generally permissible under the First Amendment. The Supreme Court's decision in *Legal Services Corp. v. Velazquez* is not to the contrary. In *Velazquez,* the Supreme Court invalidated Congressional restrictions that barred government-funded legal services attorneys "from arguing to a court that a state statute conflicts with a federal statute or that either a state or federal statute by its terms or in its application is violative of the United States Constitution." 531 U.S. at 537, 121 S.Ct. 1043. *Velazquez* hardly suggests that the government could not reward those who assist in supporting the validity of federal statutes. It rests entirely on the proposition that legal services lawyers did not perform that role. Rather they represented the interests of independent clients (who might or might not support the legislation) and not the interests of the government.[32]

In contrast, the Byrd Amendment—like qui tam proceedings, monetary awards of a portion of the government's recovery, and

---

**30.** *See* 31 U.S.C. § 3730(b) (permitting private parties to sue as qui tam relators on behalf of the government under the False Claims Act, 31 U.S.C. § 3729, which provides penalties and damages for presenting false or fraudulent monetary claims to the government); *Id.* § 3730(d) (rewarding False Claims Act qui tam relators with between 10 and 30 percent of the government's recovery).

**31.** *See, e.g.,* S.Rep. No. 94–1011, at 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5910 (discussing the Civil Rights Attorney's Fees Awards Act of 1976: "All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain."); 42 U.S.C. § 1973*l*(e) (allow-

ing attorney's fees to be awarded to prevailing parties other than the United States in the enforcement of voting rights).

**32.** The Byrd Amendment is also unlike the city ordinance granting casino development preferences only to developers promoting the passage of gambling legislation. *See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.,* 172 F.3d 397, 409–10 (6th Cir.1999) (holding that the ordinance was "content-based" and thus subject to strict scrutiny review under the First Amendment). The ordinance at issue in *Lac Vieux* did not reward the achievement of the enforcement of government policy through litigation, but instead involved "political support" for legislative efforts. *Id.* at 408.

awards of attorney's fees—shifts money to parties who successfully enforce government policy. It is significant here that those who bring and support antidumping petitions receive Byrd Amendment distributions only if the antidumping petition is successful. The Byrd Amendment does not reward unsuccessful efforts.[33] At bottom, neither SKF nor its supporting amici appear to contend that parties providing significant assistance to the government in enforcing the antidumping laws may not be rewarded.

The remaining question is whether the Byrd Amendment is overly broad. *See Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. At oral argument SKF agreed that petitioners in antidumping proceedings supply substantial assistance to the government in enforcing the trade laws. While in theory Commerce may itself initiate an antidumping duty investigation under 19 U.S.C. § 1673a(a), it is common for the government to rely on the filing of a private party petition with Commerce for an antidumping duty investigation under 19 U.S.C. § 1673a(b).[34] Not only do petitioners call the government's attention to the existence of a violation (similar to an informer), they provide substantial assistance during the course of investigations.

The general role of an antidumping petitioner is to gather and present information reasonably available to it in order to support its allegations that dumping is occurring and materially injuring a domestic industry. *See* 19 U.S.C. § 1673a(b)(1); 19 C.F.R. § 351.202(b); 19 C.F.R. § 207.11. In the antifriction bearing petition underlying this case, petitioner Torrington prepared and submitted the petition and then at two ITC proceedings appeared through counsel and submitted briefs to support its arguments. The Byrd Amendment's reward of such assistance serves to advance the government's interest in enforcing its trade laws.[35]

However, SKF appears to contend that the government's interest does not extend to rewarding those who merely support the petition.[36] The support requirement in the Byrd Amendment reflects the ITC's practice of asking questionnaire recipients to advise the ITC whether they support, oppose, or take no position on an antidumping petition. This support question is part of the ITC's material injury investigation and is not designed solely to determine eligibility for Byrd Amendment distributions. This practice indeed was established many years before the passage of the Byrd Amendment in 2000. *See,*

**33.** Fewer than half of the antidumping petitions brought from 1980 to 2006 were successful. Of the 1,110 antidumping cases, 469 or 42.3% received a final affirmative ITC determination. *See* (U.S. Int'l Trade Comm'n, *Import Injury Investigations Case Statistics (FY 1980–2006),* at 3 n. 6 (January 2008), *available at* www.usitc.gov/ trade_remedy/Report-01-08-PUB.pdf).

**34.** *See* 19 C.F.R. § 351.202(a) ("The Secretary [of Commerce] normally initiates antidumping and countervailing duty investigations based on petitions filed by a domestic interested party.").

**35.** The dissent rejects the view that rewarding petition supporters satisfies this third prong

of the *Central Hudson* test. Dissenting op. at 1373–74. For the reasons stated in the text, we disagree. Notably, the dissent fails to explain why an even narrower construction of the statute—urged by Timken—limiting the rewards to petitioners alone would not render the statute constitutional.

**36.** However, SKF itself recognizes the contribution made by petition supporters: "[i]t is based on the information supplied by the domestic producers that participate in an investigation that the ITC reaches an injury determination, which leads to the issuance of an order." Br. Pl.-Cross Appellant SKF USA Inc. at 48.

*e.g.,* J.A. 73 (Producers' Questionnaire in the ITC's antifriction bearings antidumping duty investigation in 1989); *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 981 (Fed.Cir. 1994) (referring to the support question in a 1987 ITC antidumping investigation questionnaire). Those who support antidumping petitions typically fill out questionnaires from the ITC. Each of the successful Byrd Amendment claimants here did so.

While those supporting a petition by completing a questionnaire may supply less assistance than petitioners, the *Central Hudson* test does not require perfect correspondence of means and ends. As the Supreme Court held in *Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the "not more extensive than is necessary" portion of the *Central Hudson* test requires "a fit that is not necessarily perfect, but reasonable" and "leave[s] ... to governmental decision-makers to judge what manner of regulation may best be employed." *See also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47, 67, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (upholding a statute's "incidental burden on speech" under the First Amendment because "[i]t suffices that the means chosen by Congress add to the effectiveness of" the government's substantial interest, applying the expressive conduct test formulated in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)); *El Dia, Inc. v. P.R. Dep't of Consumer Affairs,* 413 F.3d 110, 117 (1st Cir. 2005).

ITC questionnaires in particular are extremely detailed, requesting several years of data on a domestic producer's shipments, employment, sales, finances, pricing, customers, and competitors. *See, e.g.,* U.S. Int'l Trade Comm'n, Generic U.S. Producer Questionnaire, *available at* http://www.usitc.gov/trade_remedy/731_ad_701_cvd/ investigations/question/US-ProducerQuestionnaire.pdf. In proceedings before the World Trade Organization, the government has recognized that the costs of responding to such questionnaires are substantial. *See* Panel Report, *United States—Continued Dumping and Subsidy Offset Act of 2000,* ¶ 4.834, WT/DS217/R, WT/DS234/R, (Sept. 16, 2002), *available at* http://www.wto.org/english/tratop_e/dispu_e/217_234r_a_e.pdf (suggesting in a World Trade Organization proceeding that the cost of filing or supporting a U.S. antidumping petition would be "a million plus dollars"). The record here demonstrates that petition supporters in the antifriction bearing antidumping investigation spent substantial sums preparing their questionnaire responses. Indeed, the government has gone so far as to suggest that Byrd Amendment distributions are not of sufficient size to adequately compensate those who support such petitions for their efforts. *See id.* ("The costs of participating in an investigation for an industry, already materially injured or threatened with material injury, could be far greater than the [potential Byrd Amendment] disbursements received years later.").

To be sure, domestic industry participants opposing the petition are also required to fill out questionnaires, as SKF did in this case. However, Congress could permissibly conclude that it is not required to reward an opposing party.

Opposing parties' interests lie in defeating the petition, typically (as is the case here) because the domestic industry participant is owned by a foreign company charged with dumping. Indeed, SKF here undertook a role that was nearly indistinguishable from that played by a defendant in a qui tam or attorney's fees

award case. At the ITC's April 21, 1988, preliminary determination conference, SKF urged through counsel that Torrington's petition be denied, and provided an analysis of data to refute Torrington's assertion that the U.S. antifriction bearing industry was being or was about to be materially injured by dumping. At the ITC's March 30, 1989, final determination hearing, SKF urged through counsel that the domestic antifriction bearing industry was not being materially injured by dumping and was not threatened with material injury. To support this argument, SKF's president testified that the history of the production capacity, capital investments, and sales prices of the domestic antifriction bearing industry demonstrated that it was not being materially injured. SKF submitted an economic analysis brief, and at the hearing SKF's economic expert, Dr. Peter Linneman, a professor at the Wharton School of the University of Pennsylvania, testified about how his pricing analysis of the antifriction bearing industry showed no evidence of actual or threatened material injury. SKF's counsel also introduced testimony from the executives and counsel of several foreign antifriction bearing producers that opposed Torrington's petition.

Opponents may equally impede the investigation simply by refusing to cooperate. This is recognized by the statute itself, which recognizes that such failure to cooperate is a serious problem, and allows Commerce and the ITC to use "facts otherwise available" in making antidumping determinations when a party "withholds information that has been requested," "fails to provide such information," "signif-icantly impedes a proceeding," or provides unverifiable information. 19 U.S.C. § 1677e(a). The statute further allows Commerce and the ITC to find that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information," and to subject such an uncooperative party to "an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" when Commerce and the ITC make antidumping determinations. 19 U.S.C. § 1677e(b); *see also* H.R.Rep. No. 103–826 (Part I), at 105 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3877. At various times we have upheld the efforts of Commerce and the ITC to compel a response from recalcitrant respondents or use the "facts available" mechanism.[37]

At best the role of parties opposing (or not supporting) the petition in responding *to questionnaires is similar to the role of* opposing or neutral parties in litigation who must reluctantly respond to interrogatories or other discovery. There is no suggestion that such parties must be favored by an award of attorney's fees or other compensation similar to that given to prevailing plaintiffs who successfully enforce government policy. It was thus rational for Congress to conclude that those who did not support the petition should not be rewarded. We emphasize again that Congress rewards only successful enforcement effort. Where the petition is unsuccessful, neither petition supporters nor opposers receive government payments under the Byrd Amendment.

---

37. *See, e.g., Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed.Cir.2003) ("[T]he statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do."); *F. lli De Cecco Di Filippo Fara S.* *Martino S.p.A. v. United States,* 216 F.3d 1027, 1032 (Fed.Cir.2000) ("[I]t is within Commerce's discretion to choose which sources and facts it will rely on to support an adverse inference when a respondent has been shown to be uncooperative.").

In summary, the Byrd Amendment is within the constitutional power of Congress to enact, furthers the government's substantial interest in enforcing the trade laws, and is not overly broad. We hold that the Byrd Amendment is valid under the First Amendment.[38]

## III

Because it serves a substantial government interest, the Byrd Amendment is also clearly not violative of equal protection under the rational basis standard.

■ SKF's equal protection challenge to the Byrd Amendment is based on the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 498–99, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *see also Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975))). The applicable standard is rational basis review. *See Hodel v. Indiana*, 452 U.S. 314, 331, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) ("Social and economic legislation ... that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose."); *see also FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may

think a political branch has acted." (quoting *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979))). We reject SKF's equal protection challenge because we find that the Byrd Amendment is rationally related to the government's legitimate purpose of rewarding parties who promote the government's policy against dumping. The Byrd Amendment does not violate the equal protection guarantees of the Fifth Amendment.

In light of our disposition of this case, SKF's claim that the Court of International Trade improperly denied SKF's amended certification is moot.

## CONCLUSION

For the foregoing reasons, the decision of the Court of International Trade is reversed.

## REVERSED

## COSTS

No costs.

LINN, Circuit Judge, dissenting.

The so-called "petition support requirement" of the Byrd Amendment requires that a company publicly express "support of the petition" resulting in an antidumping duty order in order to be eligible to receive any funds collected as a result of the order. 19 U.S.C. § 1675c(b)(1)(A) (2000) (repealed 2006). Put simply, under the petition support requirement, if a domestic company publicly expresses the viewpoint that the government should impose a tariff on an importer, then the domestic company is eligible to receive some part of that tariff. If the domestic company either expresses the viewpoint

---

38. For the same reason, the Byrd Amendment does not fail the equal protection review applicable to statutes that disadvantage protected speech.

that a tariff should not be imposed or takes no public position, it is not eligible.

The majority concedes that the petition support requirement implicates the First Amendment, but it concludes that the Byrd Amendment satisfies the test for regulation of commercial speech, because "reward[ing] injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings" is "similar to commercially contracting with them to assist in the performance of a government function." Maj. Op. at 1352, 1355. I respectfully disagree.

The Byrd Amendment has nothing to do with rewarding helpfulness during trade investigations as the majority suggests. The majority errs by relying on the statutory construction doctrine of constitutional avoidance to graft its "reward" purpose onto the statute, when that purpose is not apparent in the statutory text or legislative history and has been expressly disclaimed by the government in this case. The majority compounds this error by using its "reward construction" of the petition support requirement to justify evaluating the constitutionality of the requirement under the more lenient commercial speech doctrine, when, in fact, the petition support requirement regulates pure political speech and—by the language of the statute itself—"petition[ing]." *See* U.S. Const. amend. 1 ("Congress shall make no law . . . abridging . . . the right . . . to petition the Government for a redress of grievances"). Because I would conclude that the petition support requirement is an unconstitutional viewpoint discriminatory restriction on political speech and petitioning activity that cannot survive strict scrutiny, I respectfully dissent.[1]

## I

Under 19 U.S.C. § 1673, an antidumping duty can only be imposed if the Department of Commerce ("Commerce") first determines that "foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value" and the International Trade Commission ("ITC") then determines that a domestic industry "is materially injured, or . . . is threatened with material injury." The purpose of an antidumping investigation is to determine whether these two criteria have been satisfied. *See, e.g.,* 19 U.S.C. § 1673a(a)(1) ("An antidumping duty investigation shall be initiated whenever the administering authority determines, from information available to it, that a formal investigation is warranted into the question of whether the elements necessary for the imposition of a duty under section 1673 of this title exist.").

Critically, an antidumping duty order is neither required nor even permitted in every case of dumping. As the majority correctly points out, "dumping" is merely "the sale or likely sale of goods at less than fair value." *Id.* § 1677(34). But an antidumping duty order requires an additional finding of material injury to the domestic industry. The companies that make up the domestic industry may reasonably disagree as to whether particular dumping has "materially injured" the domestic industry as a whole. Indeed, recognizing the complex and somewhat subjective nature of the material injury requirement, we have held that the ITC "has broad discretion" in determining whether the domestic industry has been materially injured. *Nucor Corp. v. United*

---

1. While I disagree with section II of the majority's opinion, I agree with the majority's analysis of the Court of International Trade's jurisdiction as set forth in section I of its opinion. *See* Maj. Op. § I.

*States,* 414 F.3d 1331, 1336–37 (Fed.Cir. 2005) (concluding that ITC's methodology in assessing material injury is entitled to *Chevron* deference). Thus, one member of the domestic industry may honestly believe that the industry is not harmed by particular dumping, while another member may honestly believe that the industry has been harmed. It is the ITC's obligation to sort out these conflicting views in an antidumping duty investigation.

During the course of the ITC's investigation, the ITC submits questionnaires to domestic producers in the affected industry. As the majority notes, these questionnaires are "extremely detailed, requesting several years of data on a domestic producer's shipments, employment, sales, finances, pricing, customers, and competitors" and "the costs of responding to such questionnaires are substantial." Maj. Op. at 1358. Yet all members of the domestic industry who receive such a questionnaire are required by law to complete it. *See* 19 U.S.C. § 1333(a), (f) (authorizing ITC to request information, issue subpoenas, and demand statements under oath); *see also* U.S. Int'l Trade Comm'n, Generic U.S. Producer Questionnaire (*"Producers' Questionnaire"*), at 1, *available at* http://www.usitc.gov/trade_remedy/731_ad_701_cvd/investigations/question/USProducer Questionnaire.pdf ("This report is mandatory and failure to reply as directed can result in a subpoena or other order to compel the submission of records or information in your possession...."). Moreover, each questionnaire requires

that an authorized company official certify the correctness of all responses. *Producers' Questionnaire* at 1.

The questionnaire includes various questions related to the harm that the member of the domestic industry has suffered as a result of alleged dumping. Specifically, the questionnaire includes question III–14, which asks whether the domestic company "experienced any actual negative effects on its return on investment or its growth, investment, ability to raise capital, existing development and production efforts (including efforts to develop a derivative or more advanced version of the product), or the scale of capital investments as a result of imports of" the allegedly dumped product. *Id.* at 13. Likewise, question III–15 asks whether the domestic company "anticipate[s] any negative impact of imports of" the allegedly dumped product. *Id.* Questions IV–20 and IV–21 also ask for detailed information about any lost revenues or lost sales as a result of dumping. *Id.* at 24–25.[2]

In addition to all of these questions about the harm that the alleged dumping has caused each domestic producer, the questionnaire includes, in its "General Information" section, question I–3, which asks simply "Do you support or oppose the petition?" *Id.* at 2. Question I–3 offers three possible choices with corresponding checkboxes: "Support," "Oppose," and "Take no position." *Id.* at 2.[3] It is the domestic producer's response to this question that the ITC uses to determine wheth-

---

**2.** Similar questions appeared on the version of the questionnaire that SKF completed in 1989. *See* Final Questionnaire of SKF USA, Inc. at 106–07.

**3.** The equivalent to this question that appeared in the version of the questionnaire that SKF completed in 1989 was question I.2, which asked "Please indicate, by checking the

appropriate box, the position that your firm takes with respect to the petition. (CHECK ONLY ONE)" and offered the choices "Supports the petition," "Opposes the petition," and "Does not wish to take a position on the petition." *See* Final Questionnaire of SKF USA, Inc. at 6.

er the "petition support requirement" of the Byrd Amendment has been satisfied.

Notably, Commerce also uses responses to question I–3 to determine whether a petition seeking imposition of an antidumping duty is filed "on behalf of the industry"—as is required by 19 U.S.C. § 1673a. For a petition to meet this requirement, "domestic producers or workers who support the petition [must] account for at least 25 percent of the total production of the domestic like product" and "domestic producers or workers who support the petition [must] account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition." *Id.* § 1673a(c)(4)(A)(i)-(ii). In other words, question I–3 is an opportunity for each member of the domestic industry to vote on whether a petition should or should not go forward. To go forward, the petition needs the votes of at least 25% of the domestic industry by production, and no more than 50% in opposition.

Under the Byrd Amendment, United States Customs and Border Protection ("Customs") disburses duties collected pursuant to antidumping duty orders to "affected domestic producers" who submit a certification claiming that they have incurred certain specified types of expenditures. *Id.* § 1675c. Though the ordinary meaning of "affected domestic producer" would not seem to require that the producer have taken any particular position in the antidumping duty investigation that resulted in the antidumping duty order, the Byrd Amendment includes a special definition of "affected domestic producer" that imposes just such a requirement:

The term "affected domestic producer" means any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons) that—

(A) was a *petitioner or interested party in support of the petition* with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and

(B) remains in operation.

*Id.* § 1675c(b)(1) (emphasis added).

SKF participated in the investigation that led to the antidumping order at issue in this case, but SKF opposed the petition on the ground that the domestic industry was not being materially injured by dumping. The ITC disagreed with SKF and found material injury. But even though SKF is a member of the injured industry, SKF is precluded from receiving distributions by operation of the petition support requirement, as a result of expressing its view that an antidumping duty order should not be imposed.

## II

The majority begins its First Amendment analysis by reciting the well known doctrine of constitutional avoidance, which holds that "[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (*cited in* Maj. Op. at 1349). Applying this doctrine, the majority concludes that the purpose of the Byrd Amendment was not, as the government argues, only "to compensate those who are

injured by dumping," Maj. Op. at 1351, but rather "to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings," *id.* at 26. From this conclusion, the majority reasons that evaluating the petition support requirement under the commercial speech doctrine "seems appropriate," because "[r]ewarding parties under the circumstances here is similar to commercially contracting with them to assist in the performance of a government function." *id.* at 31. Applying the *Central Hudson* test for commercial speech, the majority concludes that the petition support requirement survives First Amendment scrutiny, and that the petition support requirement "is not more extensive than is necessary to serve [the government's] interest" in rewarding injured parties who assist in antidumping investigations. *Id.* at 31 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)).

While the majority opinion is well written, thoughtful, and thorough, I respectfully disagree with several aspects of the majority's analysis. First, the majority focuses on the Byrd Amendment as a whole, rather than on the challenged portion of the Byrd Amendment—namely, the petition support requirement in the definition of "affected domestic producer." SKF does not challenge the constitutionality of imposing a duty on dumped goods that harm a domestic industry, nor does it challenge the constitutionality of distributing the duties collected as a result of antidumping orders to domestic producers. To the contrary, SKF challenges only the petition support requirement of 19 U.S.C. § 1675c(b)(1)(A). That is, SKF challenges only the aspect of the Byrd Amendment that precludes it from receiving duties

solely because it answered "Oppose" to question I–3 of the investigation questionnaire. Thus, the issue is whether the petition support requirement—not the Byrd Amendment as a whole—survives First Amendment scrutiny. *See, e.g., Republican Party of Minn. v. White,* 536 U.S. 765, 774–75, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (focusing on specific challenged clause of statute and holding that "[u]nder the strict-scrutiny test, respondents have the burden to prove that the [challenged] clause is (1) narrowly tailored, to serve (2) a compelling state interest"). Thus, it is not, as the majority suggests, the government's "interest in trade law enforcement" that matters. Maj. Op. at 1355. The relevant interest is the government's more limited interest in conditioning receipt of distributions on public support for an antidumping position.

Second, in my view, the majority's undue focus on "determin[ing] the purpose of the Byrd Amendment," *Id.* at 23, is inconsistent with the Supreme Court's First Amendment jurisprudence. The Supreme Court has made clear that it is a statute's effect on speech that matters, not its intended purpose. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) ("The Board next argues that discriminatory financial treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas. This assertion is incorrect; our cases have consistently held that illicit legislative intent is not the *sine qua non* of a violation of the First Amendment." (internal quotation marks omitted)). The question is not whether Congress intended the Byrd Amendment to violate the First Amendment. The question is whether it does.

To be sure, determining whether the government interest served by a restric-

tion on speech is "compelling"—or, in some cases, "important" or "substantial"— is a part of the First Amendment analysis. *See, e.g., Boos v. Barry*, 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (holding that content-based restrictions on political speech in public forum must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end" (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983))); *Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343 (assessing whether "the asserted governmental interest is substantial"); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (assessing whether regulation "furthers an important or substantial governmental interest"). But the Byrd Amendment's purpose plays a much greater role in the majority's analysis than serving an important government interest. The majority uses its view of the purpose of the Byrd Amendment to shield the petition support clause from strict scrutiny under the First Amendment entirely. Specifically, the majority reasons that *because* the purpose of the Byrd Amendment was to reward injured parties who assisted government enforcement of the antidumping laws, then the petition support requirement is "similar to commercially contracting with [parties] to assist in the performance of a government function, in this particular context assisting in the enforcement of government policy in litigation." Maj. Op. at 1355. Thus, the majority uses the purpose of the Byrd Amendment as justification for applying the more lenient *Central Hudson* test, rather than strict scrutiny. I know of no case—and the majority has cited none—in which an unambiguous statute that would otherwise be subject to strict constitutional scrutiny

receives more lenient scrutiny because of its perceived purpose.

Third, I believe that the majority is incorrect in concluding that that purpose is to reward parties that assist the government in antidumping investigations. *Id.* at 1352 ("[T]he purpose of the Byrd Amendment's limitation of eligible recipients was to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings."). There is nothing in the statutory text or legislative history of the Byrd Amendment to suggest that its purpose was to reward assistance or cooperation with the government's investigation of dumping. To the contrary, the purpose of the Byrd Amendment was to compensate domestic producers injured by dumping. The text and structure of the statute itself makes that clear in specifying that distributions are made to "affected domestic producer[s]"—domestic producers that have been "affected" (i.e., injured) by dumping. 19 U.S.C. § 1675c. The majority relies on general statements in the Congressional findings that "United States unfair trade laws have as their purpose the restoration of conditions of fair trade" and that "injurious dumping is to be condemned." Maj. Op. at 1352. But neither these statements nor anything else in the statutory text says anything at all about rewarding parties for "assist[ing] government enforcement" in antidumping proceedings.

Moreover, the legislative history of the Byrd Amendment supports the view that its purpose was to compensate injured domestic producers: "Current law also does not contain a mechanism to help injured U.S. industries recover from the harmful effects of foreign dumping and subsidization." 145 Cong. Rec. S497, 497 (1999)

(statement of Sen. DeWine). The majority's reliance on general statements in the legislative history—e.g., that the Byrd Amendment is necessary to "deter unfair trade practices" and that "United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved"—is to no avail, because none of these statements says anything about rewarding parties for helping to enforce trade laws. Maj. Op. at 1352.

I note further that the majority's "reward for assistance" rationale was not argued by either of the two government agencies that are parties to this appeal. To the contrary, the government argued that the purpose of the Byrd Amendment was *solely* compensation for injury, not reward for assistance: "Simply stated, as a supplement to unfair trade laws already in existence, in the [Byrd Amendment], Congress chose to provide a separate monetary remedy to a subset of domestic producers that were the *most seriously injured* by foreign unfair trade practices, and it rationally assumed that this subset of most-harmed producers would be those producers that had supported the petition." Br. of Defendant–Appellant U.S. Customs & Border Protection at 20–21 (emphasis added). At oral argument, the government expressly and repeatedly rejected the court's suggestion that the Byrd Amendment was intended to reward parties for assisting the government. *See* Oral Arg. at 14:25–31, 15:18–23 available at http://oralarguments.cafc.uscourts.gov/mp

3/2008–1005.mp3 (government responding to question about purpose of Byrd Amendment "to reward people who bring these antidumping petitions and those who support the petition" by stating that "[t]he purpose of this classification should not really be seen as one of rewarding"); *id.* at 25:15–31 ("There is nothing in that statute, your honor, that indicates any attempt to reward parties as opposed to provide a subsidy to American manufacturers who have been injured."); *id.* at 1:03:42–1:04:36 ("The parties seem to be in agreement that this statute and the classification is really not that similar to the situation of relators in qui tam cases where they are providing a service to the government and receiving some amount by statute as a reward for having brought to the attention of the government fraud, waste, and abuse."); *see also id.* at 23:34–24:03 ("It was ... apparent on the face of the findings of Congress that preceded the [Byrd Amendment] and also the floor statements of Senator DeWine and Senator Byrd that this was intended to be a remedial statute that was going to aid members of domestic industry that continue to be injured by dumping....").

The majority dismisses the government's repeated statements rejecting the "reward for assistance" rationale.[4] Specifically, the majority argues that "the views of the government as litigator are simply not binding on the issue of Congressional intent." Maj. Op. at 1352. But—as the majority's own parenthetical summaries

---

**4.** The majority states that I "rely[ ] primarily on the government's representations at oral argument" to conclude that the purpose of the Byrd Amendment is not the "reward for assistance" rationale that the majority advances. Maj. Op. at 1352. As discussed in detail, the statutory text of the Byrd Amendment, its legislative history, the conduct of antidumping investigations in practice, and

the example of this very case all make clear that the purpose of the Byrd Amendment was not to reward companies for assisting the government in antidumping investigations. The fact that the government agrees that "reward for assistance" was not the purpose of the Byrd Amendment is only one of many reasons that I would reject it.

make clear—the cases that the majority cites for that proposition all address the views of the government as to the proper interpretation of ambiguous statutory language, not to the asserted *purpose* of a statute for purposes of constitutional scrutiny. *See Id.* ("*Cherokee Nation of Okla. v. Leavitt,* 543 U.S. 631, 646–57, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005) (recognizing and then rejecting the government's *interpretation of a statute* ); *United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 223, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) (rejecting the government's *interpretation of a tax statute* )" (emphases added)). The Supreme Court has recognized that it is the government's "asserted" purpose that is relevant in assessing the constitutionality of a statute—i.e., the purpose that the government as litigator asserts to justify the statute in the face of a constitutional challenge. *See, e.g., City of Erie v. Pap's A.M.,* 529 U.S. 277, 296, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) ("The asserted interests ... are undeniably important"); *Texas v. Johnson,* 491 U.S. 397, 407, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("[W]e must decide whether Texas *has asserted an interest* in support of Johnson's conviction that is unrelated to the suppression of expression. . . . " The State offers two separate interests to justify this conviction. . . .) Thus, the burden is on the government—in litigation—to identify the interest served by the regulation and to prove that it is "compelling," "substantial," or "important." *See, e.g., Boos,* 485 U.S. at 321, 108 S.Ct. 1157 ("[W]e have *required the State to show* that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." (internal quotation marks omitted and emphasis added)). In fact, in *Central Hudson*—the very case that establishes the

commercial speech test that the majority applies—the Supreme Court made clear that it is the interest that the government asserts in litigation challenging a regulation that is relevant for the constitutional inquiry:

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the *asserted* governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest *asserted,* and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343 (emphases added). Thus, it is the government's asserted purpose—not the "reward for assistance" purpose expressly rejected by the government—that is relevant to the First Amendment analysis here. It is not the role of the court to substitute its judgment for that of the government and to decide which interest the government should have "asserted."

The majority also relies heavily on the doctrine of constitutional avoidance, which it suggests "extends to the ascertainment of a statute's purpose." Maj. Op. at 1353. The well-established "canon of constitutional avoidance" holds that "[w]here a possible construction of a statute would render the statute unconstitutional, courts must construe the statute 'to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Consolidation Coal Co. v. United States,* 528 F.3d 1344, 1347 (Fed.Cir.2008) (quot-

ing *Edward J. DeBartolo Corp.*, 485 U.S. at 575, 108 S.Ct. 1392). The doctrine of constitutional avoidance is a doctrine of statutory interpretation—that is, it is relevant when the court is construing disputed statutory language. *See, e.g., Fisherman's Harvest, Inc. v. PBS & J*, 490 F.3d 1371, 1377 (Fed.Cir.2007) (discussing "canon of constitutional avoidance in statutory interpretation"). In this case, there is no statutory construction to be performed. The parties do not dispute the meaning of the petition support requirement, and the parties do not dispute that, if the petition support requirement is constitutional, it was correctly applied to SKF. There is therefore no statutory construction dispute, and the doctrine of constitutional avoidance is irrelevant.

The majority, however, reasons that the doctrine of constitutional avoidance "extends to the ascertainment of a statute's purpose." Maj. Op. at 1353. That is, in the majority's view, when evaluating whether a statute serves a compelling, substantial, or important government interest, the court should look not to the interest that is clear from the statutory text or legislative history, nor to the interest that the government actually puts forward during litigation, but rather to any interest that "would make the statute constitutional." *Id.* at 1354. I respectfully disagree. While it is proper under rational basis review to evaluate whether any hypothetical interest would render a statute constitutional, under the heightened scrutiny required by the First Amendment, we evaluate only the government's actual, asserted interest. *See, e.g., Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373–74, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) ("The dissent describes another governmental interest.... Nowhere in its briefs, however, does the Government ar-

gue that this interest motivated the advertising ban. Although, for the reasons given by the dissent, Congress conceivably could have enacted the advertising ban to advance this interest, we have generally only sustained statutes on the basis of hypothesized justifications when reviewing statutes merely to determine whether they are rational. The *Central Hudson* test is significantly stricter than the rational basis test ...." (citations omitted)); *Edenfield v. Fane*, 507 U.S. 761, 768, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) ("Unlike rational-basis review, the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions."). I cannot agree that the doctrine of constitutional avoidance allows us to ignore the government's asserted purpose and substitute our own when heightened First Amendment scrutiny applies.

Moreover, though the majority cites two cases for its theory that the doctrine of constitutional avoidance extends to the "ascertainment of a statute's purpose," Maj. Op. at 1353, those cases actually involve the interpretation of statutory language—not the government interest served by the statute. In the pre-*Lochner Delaware & Hudson* case on which the majority principally relies, the Supreme Court did apply the principle of constitutional avoidance and make reference to the government's view concerning the "result intended to be accomplished" by the statutory provision at issue, but it did so solely for the purpose of construing disputed statutory language. *See U.S. ex rel Attorney Gen. v. Del. & Hudson Co*, 213 U.S. 366, 404–05, 29 S.Ct. 527, 53 L.Ed. 836 (1909) ("Let us, *as a prelude to an analysis of the [statutory] clause, for the purpose of fixing its true construction,* and determining the constitutional power to enact it when its signifi-

cance shall have been rightly defined, point out the questions of constitutional power which will require to be decided if the construction relied upon by the government is a correct one."). Likewise, the *Zadvydas* case on which the majority relies considered the doctrine of constitutional avoidance solely for the purpose of statutory construction. *See Zadvydas v. Davis*, 533 U.S. 678, 689–90, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("[W]e read an implicit limitation into the statute before us. In our view, the statute, read in light of the Constitution's demands, limits an alien's postremoval-period detention to a period reasonably necessary to bring about that alien's removal from the United States.... A statute permitting indefinite detention of an alien would raise a serious constitutional problem."). I am aware of no case in which the Supreme Court has applied the doctrine of constitutional avoidance—as the majority does here—to determine the asserted purpose of an unambiguous statute in a constitutional challenge.

It also seems to me that the "reward for assistance" rationale for the Byrd Amendment makes little sense in light of the regulations governing the conduct of antidumping investigations. All members of the domestic industry who receive a questionnaire—whether they support the petition or not—are required to complete the questionnaire and to certify to its accuracy. Moreover, the ITC has the authority to subpoena any additional information that it needs from otherwise unwilling companies. *See* 19 U.S.C. § 1333(a), (f); *Producers' Questionnaire* at 1. This explains why the government admitted at oral argument that petition supporters and petition opponents provide exactly the same assistance to the government in antidumping investigations. *See* Oral Arg. 22:41–23:07 ("[W]hat the government ob-

tains form the questionnaire responses is the same for those who supported and thereby are eligible under the classification the [Byrd Amendment] to receive these funds and for those who opposed or took no position. So, *they are also aiding the government* in a government function in that respect. Certainly that is true." (emphasis added)); *see also id.* at 18:50–19:10 ("[Companies that do not support the petition] are required by law to respond to the questionnaire in the same way that those who have answered the question checking support are required to do so."); *id.* at 20:10–28 ("[The Court:] Is there something different that parties who support the petition provide to the government as compared to parties that don't support the petition? [The government:] Not that I'm aware of. I don't think that that is an important distinction....").

The facts of this case illustrate why the purpose of the Byrd Amendment cannot have been the reward for assistance rationale that the majority suggests. The majority details the submissions that petitioner Torrington and petition supporters made during the investigation that led to the antidumping order in this case. *See* Maj. Op. at 1342 (noting that "the petition was over 200 pages in length"); *id.* at 1343–44 ("The questionnaire responses of these petition supporters were hundreds of pages long, and several of the supporters prepared responses exceeding 300 pages."); *id.* at 11 ("Petitioner Torrington's pre-hearing brief was over 200 pages long...."). The majority also notes that "SKF also responded to the ITC's questionnaire, but stated that it opposed the antidumping petition," *id.* at 1343, but what the majority fails to point out is that SKF's questionnaire responses also totaled *more than 200 pages. See* Preliminary and Final Responses of SKF USA, Inc.

(242 pages). In fact, if, as the majority's analysis suggests, assistance in an antidumping investigation can be measured in part by the page length of questionnaire responses, SKF was actually *more* helpful that several supporters of the petition that have received distributions under the Byrd Amendment. *See, e.g.,* Response of Emerson Power Transmission Co. (122 pages). Likewise, while the majority claims that Torrington's briefing "assisted in the investigation," Maj. Op. at 1343, it fails to acknowledge that SKF also submitted briefing—totaling 163 pages—during the investigation.

To the extent that the majority recognizes SKF's participation in the antidumping investigation, the majority sees it as evidence *against* SKF, going so far as to suggest that SKF "impede[d] the investigation" by opposing it. *See Id.* at 39–40. However, SKF did nothing to impede, and merely expressed its view that the domestic industry was not being or about to be materially injured by the alleged dumping. SKF, like other petition opponents, submitted expert analysis and briefing supporting that view to the ITC. The majority does not suggest that SKF withheld any information or submitted any evidence or argument in bad faith. To the contrary, SKF's only "fault" was that the ITC ultimately disagreed with it and concluded that the domestic industry was, in fact, harmed—a decision that the ITC had not yet made at the time SKF opposed the petition, and a decision that we have held is firmly committed to the ITC's discretion. *See Nucor,* 414 F.3d at 1336 (noting ITC's "broad discretion" in assessing material injury). If taking an opposing view in a proceeding were tantamount to "impeding" an investigation, then every losing party in every action to which the government is a party (not to mention every criminal defense attorney) would be guilty of obstruction. SKF, acting in good faith, assisted in the antidumping investigation by complying with its obligation to submit detailed questionnaire responses, by submitting expert evidence and briefing, and by providing its honest viewpoint to the ITC. The only difference between SKF and the petition supporters was that SKF thought that the ITC should have come to a different conclusion. This illustrates precisely why rewarding petition supporters for their assistance in an investigation cannot have been the Byrd Amendment's purpose.

My fourth disagreement with the majority concerns its conclusion that the First Amendment test for commercial speech "seems appropriate" in this case. Citing *Central Hudson,* the majority concludes that the Supreme Court has "broadly defined 'commercial speech' as 'expression related solely to the economic interest of the speaker and its audience.'" Maj. Op. at 1355. But *Central Hudson* did not concern whether the speech at issue—advertising by an electric company—was or was not commercial. The parties agreed that the speech was commercial. *Central Hudson,* 447 U.S. at 560–61, 100 S.Ct. 2343. The case in which the Supreme Court actually considered the definition of commercial speech came three years later. In *Bolger v. Youngs Drug Products Corp.,* the Supreme Court considered whether informational pamphlets distributed by a contraceptive manufacturer and promoting the use of prophylactics were commercial speech. 463 U.S. 60, 62, 65–66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). The Supreme Court recognized that "the core notion of commercial speech [is] speech which does no more than propose a commercial transaction." *Id.* at 66, 103 S.Ct. 2875 (internal quotation marks omitted).

Nevertheless, the Supreme Court concluded that the pamphlets were commercial speech:

> The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech. Similarly, the reference to a specific product does not by itself render the pamphlets commercial speech. Finally, the fact that [the manufacturer] has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech.
>
> The combination of *all* these characteristics, however, provides strong support for the District Court's conclusion that the informational pamphlets are properly characterized as commercial speech.

*Id.* at 66–67, 103 S.Ct. 2875 (citations omitted). The Court went on to say that "[a] company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." *Id.* at 68, 103 S.Ct. 2875. Thus, as one commentator has put it, speech is commercial under *Bolger* if: "(1) [i]t is an advertisement of some form, (2) it refers to a specific product, and (3) the speaker has an economic motivation for the speech." Er-

win Chemerinsky, *Constitutional Law: Principles and Policies* § 11.3.7.2.

The speech affected by the petition support clause is not commercial speech under *Bolger*. A statement compelled in response to an ITC questionnaire is not an advertisement, nor does it refer to a specific product. SKF may have had "an economic motivation" for answering the questionnaire, but, as *Bolger* makes clear, "an economic motivation ... would clearly be insufficient by itself to turn [speech] into commercial speech." *Bolger*, 463 U.S. at 67, 103 S.Ct. 2875; *see also Bigelow v. Virginia*, 421 U.S. 809, 818, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) ("The State was not free of constitutional restraint merely ... because appellant's motive or the motive of the advertiser may have involved financial gain. The existence of commercial activity, in itself, is no justification for narrowing the protection of expression secured by the First Amendment." (citations and internal quotation marks omitted)). To the contrary, SKF's response to the question "Do you support or oppose the petition?" is precisely the kind of "direct comment[ ] on public issues" for which it has "the full panoply of protections available" under the First Amendment.[5]

Moreover, even if the majority were correct that the test for commercial speech is whether the regulated "expression re-

---

5. The majority also relies on a recent case from the First Circuit that, as an alternative ground for its decision, reasoned that the transfer of data that identified which physicians had prescribed specific pharmaceuticals was commercial speech. *See* Maj. Op. at 1355 (citing *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 54–55 (1st Cir.2008)). In that case, the First Circuit rejected a "narrower definition of commercial speech limited to activities 'propos[ing] a commercial transaction,'"- and instead reasoned that the data transfer at issue "at most embod[ied] expression related

solely to the economic interest of the speaker and its audience." *IMS*, 550 F.3d. at 54. The *IMS* case plainly involved the sale of data—i.e., a commercial transaction that involved payment for the supposed "speech," which the court reasoned was actually not speech at all, but rather conduct. *Id.* To the extent that the majority concludes that *IMS* stands for the broader proposition that any speech that involves the "economic interests of the speaker" is commercial speech, I respectfully submit that either the majority's reading of *IMS* is incorrect, or *IMS* was incorrectly decided.

late[s] solely to the economic interests of the speaker and its audience," Maj. Op. at 1355, I cannot agree that this test is satisfied here. The majority reasons that "[r]ewarding parties under the circumstances here is similar to commercially contracting with them to assist in the performance of a government function, in this particular context assisting in the enforcement of government policy in litigation." *Id.* The majority's analysis, however, does not actually address the speech at issue. The petition support clause conditions receipt of funds on expressing support for an antidumping petition. The question is whether *that* regulated expression—namely, expressing support for an antidumping petition—"relate[s] solely to the economic interests of the speaker and its audience." The majority's view that companies who support a petition are more likely to provide assistance to the government and therefore enter into a quasi-contractual relationship is immaterial. The issue is simply whether the expression of support itself relates solely to the economic interests of the company and the audience. Even setting aside whether a statement of support for a petition reflects the economic interests of the company making a statement, it cannot be said that the petition support requirement relates solely to the economic interest of the audience—here, the ITC. The ITC had no economic interest in whether SKF expressed support for the petition or did not. Thus, I cannot agree that the majority's "commercial contract" analogy, even if correct, would support application of the commercial speech doctrine under *Central Hudson.*

Further, it is noteworthy that the majority's view that the commercial speech test "seems appropriate" is not a view shared by any party to this case. Nowhere in any of its briefing does either the

government or the ITC argue that the commercial speech doctrine is applicable. Moreover, appellant Timken expressly argues that the commercial speech doctrine is *not* applicable. *See* Response–Reply Br. of Defendant–Appellant Timken U.S. Corporation at 41 n. 48 ("Providing factual information to the ITC bears no resemblance to the concept of commercial speech, and, by definition, the [Byrd Amendment] does not involve the regulation of commercial speech, which has generally been defined as 'speech proposing a commercial transaction.' "). I agree with the parties that the commercial speech doctrine is inapplicable.

Fifth, even if the majority were correct that *Central Hudson*'s test for the constitutionality of commercial speech were the correct test, I cannot agree with the majority that the petition support requirement would survive that test. In *Central Hudson,* the Supreme Court held that:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. Even assuming that the other elements of the *Central Hudson* test could be met, the petition support requirement cannot satisfy the final element, because it cannot be said to be "not more extensive than is necessary to serve [the asserted] interest." *Id.*

If, as the majority reasons, the government interest furthered by the petition support requirement is "to reward injured parties who assisted government enforcement" in antidumping investigations, Maj. Op. at 1352, then the petition support requirement is far more extensive than is necessary to serve that interest. A much more straightforward method of ensuring the cooperation of private parties in antidumping investigations would be simply for the ITC to compel the cooperation of uncooperative parties through the subpoena process—as it already has the authority to do. *See* 19 U.S.C. § 1333(a), (f). Moreover, to the extent that Congress intended to compensate parties for the expense of preparing petitions or questionnaire responses as the majority suggests, *see* Maj. Op. at 1358–59, it could simply authorize reimbursement of reasonably incurred expenses to parties that cooperate willingly—a far less restrictive measure than precluding petition opponents from receiving any remedial duties. Reasoning that *Central Hudson* does not require a perfect fit between means and ends, the majority argues that "[t]hose who support antidumping petitions typically fill out questionnaires from the ITC." *Id.* at 1358. But the majority ignores that all *recipients* of questionnaires are *required* to complete them—whether they support or oppose the petition. Indeed, by definition, a party excluded from receiving disbursements as a result of checking the "Oppose" box in response to questionnaire question I–3 has *necessarily* filled out the questionnaire. While *Central Hudson* may not require a

perfect correspondence of means and ends, I cannot agree that the petition support requirement places is "not more extensive than necessary" to the furtherance of an alleged interest in rewarding cooperation in an antidumping investigation.[6]

Even if the interest served by the petition support requirement were the interest identified by the government—namely, "provid[ing] a separate monetary remedy to a subset of domestic producers that were the most seriously injured by foreign unfair trade practices," Br. of Defendant–Appellant U.S. Customs & Border Protection at 20–21—I would still conclude that it fails to satisfy the final element of the *Central Hudson* test. It may be true that a party that is more seriously injured by dumping is more likely to check the "Support" box in response to question I–3 than a party that is less seriously injured. But *Central Hudson* requires more: that the regulation be not more extensive than necessary.

If the government interest is to compensate the most seriously injured domestic producers, the ITC could look to the detailed financial data provided in response to the rest of the questionnaire, determine for itself which producers are most seriously injured, and distribute collected duties accordingly. Because these better proxies exist (and, in fact, are already part of the questionnaire), the government is wrong to assert that a company's response to question I–3 places a burden on speech that is not more extensive than necessary to accomplish its goal of compensating the most seriously injured producers.

---

6. The majority questions my seeming failure to explain why an even narrower construction of the Byrd Amendment—"limiting the rewards to petitioners alone"—would not meet the final requirement of the *Central Hudson* test. *See* Maj. Op. at 1357 n. 35. Because the majority does not adopt this narrower construction, the significance of the majority's criticism is not clear. In any event, as discussed in detail below, I disagree that limiting distributions to petitioners alone would cure the First Amendment problem. *See infra* at 1357–58.

Not only is the petition support requirement not the best proxy for injury, it is not even a particularly good one. As the Court of International Trade found, "there are a multitude of reasons why an entity might decide to support, oppose, or take no position in an antidumping investigation" that are unrelated to the seriousness of its injury. *SKF USA Inc. v. United States,* 451 F.Supp.2d 1355, 1362 (Ct. Int'l Trade 2006). A domestic company, like SKF, that is a subsidiary of a foreign importer, might oppose a petition because it concludes that the worldwide injury caused to its parent by an antidumping duty order would be greater that the injury that the subsidiary suffers domestically as a result of dumping. More altruistically, a company might simply have the ideological view that any restrictions on trade—including restrictions on dumping—are bad. It might be willing to endure serious injury resulting from dumping, rather than support a petition that would, in its view, restrict free trade. Finally, as was the case with amicus Giorgio Foods, Inc., a domestic producer might oppose a petition to protect business relationships in foreign countries having nothing to do with the domestic market, or it might decline to support a petition for fear of retaliation in export markets. *See* Br. of Amicus Curiae Giorgio Foods, Inc. & PS Chez Sidney LLC at 2, 9–10. To conclude summarily, as the government does, that the petition support requirement identifies the most seriously injured domestic producers evinces a naive view of the economics of international trade. Thus, I cannot conclude that the final element of the *Central Hudson* test would be met, applying either the majority's or the government's asserted government interest.[7]

Sixth and finally, the majority's analogy to qui tam actions is simply inapposite. The primary federal qui tam statute is the False Claims Act, 31 U.S.C. §§ 3729–33. Under § 3730(b) of the False Claims Act, a private person may bring an action in the name of the government against a defendant believed to have knowingly presented a false or fraudulent claim for payment to the government. If the defendant is proven to have presented a false claim, the defendant is liable to the government, and the private party who initiated the action may receive up to a thirty percent share of the proceeds of the action or settlement, and reasonable expenses, costs, and attorneys fees. *Id.* § 3730(d). *See generally Cook County, Ill. v. United States ex rel. Chandler,* 538 U.S. 119, 122–23, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (describing qui tam provisions of False Claims Act). Qui tam actions for false patent marking work in the same way. *See* 35 U.S.C. § 292(b) ("Any person may sue for the penalty [of $500 per offense for falsely marking an article as patented or 'patent pending'], in which event one-half shall go to the person suing and the other to the use of the United States.").

The majority analogizes antidumping proceedings to qui tam actions, reasoning

---

7. In a footnote, the majority asserts an alternative basis for affirmance: "[e]ven if we apply the test for speech combined with conduct in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), for reasons that are clear from the text the Byrd Amendment would still be constitutional." Maj. Op. at 1355 n. 28. I respectfully disagree. For the same reasons that it cannot satisfy *Central Hudson*'s "not more extensive than is necessary" requirement, the Byrd Amendment cannot meet *O'Brien*'s requirement that any "incidental restriction on alleged First Amendment freedoms [be] no greater than essential to the furtherance of [the government's asserted] interest." *O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673.

that the operation of the Byrd Amendment, like a qui tam proceeding, "reward[s] private parties for successfully bringing suit on behalf of the government." Maj. Op. at 1356. It carries this analogy further, arguing that "SKF here undertook a role that was nearly indistinguishable from that played by a defendant in a qui tam or attorney's fees award case" by opposing the antidumping petition. *Id.* at 1358–59. To be sure, Commerce and the ITC rely on private companies—namely, members of the domestic industry that have been harmed by dumping—to bring dumping to its attention through the petition process. But beyond that, the analogy to qui tam proceedings fails. In a qui tam case, the defendant has committed a violation of the law that causes harm to the government, and the government shares its recovery with the plaintiff—an uninjured third party. In other words, a qui tam action is an action by a representative (the plaintiff) against a wrongdoer (the defendant), on behalf of a victim (the government).

By contrast, when a foreign company improperly dumps goods in the domestic market, the foreign company is the wrongdoer, and its victims are the members of the domestic industry. A petitioner brings an action on behalf of the injured domestic industry. Thus, an antidumping action by petition is an action by a representative (the petitioner) against a wrongdoer (the foreign company), on behalf of victims (the members of the domestic industry). In summary form:

|  | Representative |  | Wrongdoer |  | Victim |
|---|---|---|---|---|---|
| Qui tam | Plaintiff | v. | Defendant | on behalf of | Government |
| Antidumping investigation | Petitioner | v. | Foreign company | on behalf of | Domestic industry |

Two obvious distinctions are apparent. First, in qui tam proceedings it is the government—the victim—that willingly elects to share a portion of its compensation with the uninjured plaintiff representative, essentially as a bounty for bringing the action. But in an antidumping investigation, the government is not the injured party. It is the members of the domestic industry—not only including the petitioner and petition supporters, but also including all other domestic producers—that are injured and entitled to compensation for its injury.

Second, the majority is wrong to equate SKF to a defendant in a qui tam action. The defendant in a qui tam action is the wrongdoer—the company that violates the law. In an antidumping investigation, the role of the qui tam defendant is played by the foreign company that does the dumping. SKF was a victim of that dumping as one of the injured members of the domestic industry. In sum, the majority's analogy to qui tam proceedings is simply inapposite, and it cannot shield the petition support requirement from First Amendment scrutiny. The government recognized as much at oral argument, remarking that "[t]he parties seem to be in agreement that this statute and the classification is really not that similar to the situation of [plaintiffs] in qui tam cases." Oral Arg. at 1:03:42–1:04:36.

### III

In my view, the petition support requirement should be subjected to strict scrutiny as a content-based restriction on political speech in a public forum. The principles

that control the outcome of this case are beyond serious dispute. First, "a *content-based* restriction on *political speech* in a *public forum* ... must be subjected to the most exacting scrutiny. Thus, [the government must] show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Second, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger v. Rector of Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (citation omitted). Third, under the so-called "unconstitutional conditions" doctrine, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

Taken together, these principles establish—at an absolute minimum—that a regulation is subject to strict scrutiny if it denies a benefit on the basis of expression of a specific viewpoint on a political matter in a public forum. *Cf. Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.,* 172 F.3d 397, 409–10 (6th Cir.1999) (holding that ordinance that "grants benefits and imposes burdens according to whether an individual or entity sufficiently supported a particular political issue" was subject to strict scrutiny). I would conclude that the petition support requirement denies a benefit on the basis of expression of a viewpoint on a political matter in a public forum, and is therefore subject to strict scrutiny.

First, in my view, the petition support requirement is viewpoint discriminatory. Under the petition support requirement, a domestic company is ineligible for a distribution unless the company was in "support of the petition," as indicated by its response to question I–3, "Do you support or oppose the petition?" 19 U.S.C. § 1675c(b)(1)(A); *Producers' Questionnaire* at 2. Domestic companies who express the viewpoint that an antidumping order should issue are eligible; companies who do not express that viewpoint are not. This is classic viewpoint discrimination. As discussed in detail above, *see supra* at 9, it is immaterial that the government does not intend to suppress a particular viewpoint. It is the viewpoint-discriminatory *effect* of the statute that offends the First Amendment.

Second, the petition support requirement affects political speech. "Political speech, of course, is 'at the core of what the First Amendment is designed to protect.' " *Morse v. Frederick,* 551 U.S. 393, 127 S.Ct. 2618, 2626, 168 L.Ed.2d 290 (2007) (quoting *Virginia v. Black,* 538 U.S. 343, 365, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003)). Moreover, political speech is not merely advocacy on behalf of a particular candidate. Rather, it encompasses "the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). In this case, the petition support require-

ment requires that a domestic company have expressed the view that a duty should be imposed on a specific class of foreign goods, based in part on whether the domestic industry has been or will be "materially injured." *See* 19 U.S.C. § 1673. Notably, not only does the ITC consider the views of opponents when deciding whether the material injury requirement has been met, but § 1673 actually precludes a petition from going forward unless it has support from 25% of the domestic industry by production, and no more than 50% in opposition. *See* 19 U.S.C. § 1673 a(c)(4)(A)(i)-(ii). Taking a position on this question before the ITC—the body charged with determining whether there has been or will be material injury—is therefore not only political speech on an issue of public concern, but effectively a vote on whether the petition should go forward. It is therefore plainly political speech at the core of the First Amendment's protection.

For the same reasons that it affects political speech, the petition support requirement implicates the First Amendment's Petition Clause. As the Supreme Court has explained:

> The right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression. In *United States v. Cruikshank*, 2 Otto 542, 92 U.S. 542, 23 L.Ed. 588 (1876), the Court declared that this right is implicit in "[t]he very idea of government, republican in form." *Id.*, at 552. And James Madison made clear in the congressional debate on the proposed amendment that people "may communicate their will" through direct petitions to the legislature and government officials. 1 Annals of Cong. 738 (1789).

*McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). By conditioning receipt of a benefit on the expression of a particular view to the governmental agency charged with making a decision, the petition support requirement necessarily impedes companies from "communicat[ing] their will" to the relevant government officials.

Third, the petition support requirement affects speech in a designated public forum. The government creates a designated public forum when it makes a space "generally available to a certain class of speakers." *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). The ITC not only creates a designated public forum for domestic producers by inviting them to share their views on a petition, but it in fact *requires* them to do so. *See* 19 U.S.C. § 1333(a), (f); *Producers' Questionnaire* at 1. Moreover, the petition support requirement requires both that the domestic producer support the petition, and that it allow its support to be publicly known. *See* 19 U.S.C. § 1675c(d) (requiring publication of qualified recipients of distributions). I would conclude in these circumstances that an ITC proceeding is a limited public forum for speech by domestic producers.

We are, of course, not the first court of appeals to consider the constitutionality of a government regulation that provides a benefit to a party as a reward for prior political expression. The closest analogous case in the regional circuits is the Sixth Circuit's decision in *Lac Vieux,* 172 F.3d 397, *appeal after remand* 276 F.3d 876 (6th Cir.2002), *cert. denied,* 536 U.S. 923, 122 S.Ct. 2589, 153 L.Ed.2d 779 (2002). In that case, two casino developers had spent substantial sums of money to advertise and

promote the passage of a ballot initiative to legalize casino gambling in Detroit, Michigan. *Id.* at 400. After the ballot measure passed, the Detroit City Council adopted an ordinance giving preference for casino licenses to developers who had actively promoted the ballot initiative. *Id.* at 401. The Lac Vieux Desert Band of Lake Superior Chippewa Indians—a potential casino developer that had not lobbied for passage of the ballot initiative but wanted a casino license—challenged the ordinance on First Amendment grounds. *Id.* at 402. The Sixth Circuit held that the ordinance "impose[d] a burden based on the content of political speech" and that the ordinance was content based and therefore subject to strict scrutiny. *Id.* at 409–10.

The majority dismisses *Lac Vieux* in a footnote, reasoning that it "did not reward the achievement of the enforcement of government policy through litigation, but instead involved 'political support' for legislative efforts." Maj. Op. at 1356 n. 32. I agree that an ITC investigation is not an election by ballot initiative, but I do not think that this distinction is of any significance. "[T]he free discussion of governmental affairs" protected by the First Amendment encompasses more than merely campaigning. *Mills,* 384 U.S. at 218, 86 S.Ct. 1434. Moreover, because the ITC requires domestic producers to provide their views on a petition and is required to take those views into account, the petition support requirement, like the ordinance in *Lac Vieux,* does concern a company's "political support" for a proposition (as in *Lac Vieux* ) or a petition (as in this case).

I would conclude that because the petition support requirement is viewpoint discriminatory toward political speech in a public forum, it is subject to strict scrutiny. To survive, it must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Perry,* 460 U.S. at 45, 103 S.Ct. 948. Even assuming that the interests asserted by the majority (reward for assistance) and the government (remedy for the most seriously injured domestic producers) were compelling, I cannot conclude that the petition support requirement is narrowly drawn to achieve either. As discussed in detail above, less restrictive means exist to achieve either interest. *See supra* at 23–26. I would therefore conclude that the petition support requirement is unconstitutional.

## IV

Because I would affirm the judgment of the Court of International Trade that the petition support requirement is unconstitutional,[8] I briefly address the remaining issues concerning severance and SKF's amended certification.

### A. Severance

"[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it valid." *El Paso & N.E. Ry. Co. v. Gutierrez,* 215 U.S. 87, 96, 30 S.Ct. 21, 54 L.Ed. 106 (1909).

---

**8.** I agree with the majority's conclusion that, if the Byrd Amendment were subject to rational basis review under the Equal Protection Clause, it would survive—though I do so for different reasons. Though the petition support requirement is not a good proxy for the seriousness of a domestic producer's inju-ry, I would not conclude, as the Court of International Trade did, that it is an *irrational* proxy. I would therefore affirm the judgment of the Court of International Trade solely on the alternative basis that the petition support requirement violates the First Amendment.

Timken argues that even if the petition support requirement is unconstitutional, the Court of International Trade erred by severing the statute so that opponents of a petition were eligible for benefits. Instead, Timken contends that the statute should be severed so that only petitioners—not any other "interested part[ies] in support of the petition"—would be eligible for distributions.

There are two problems with Timken's proposed approach. First, it would run contrary to Congress's intent, clear from the face of the statute, to distribute collected duties to "affected domestic producers." "[T]he touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'" *Ayotte v. Planned Parenthood*, 546 U.S. 320, 330, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (quoting *Califano v. Westcott*, 443 U.S. 76, 94, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979) (Powell, J., concurring in part and dissenting in part)). Here, Congress's intent is clear from the overall structure of the Byrd Amendment. The Byrd Amendment authorizes distributions to "affected domestic producers." 19 U.S.C. §§ 1675c(b)-(d). The petition support requirement is only one of several parts of the definition of "affected domestic producers"—an "affected domestic producer" must also be a "manufacturer, producer, farmer, rancher or worker representative (including associations of such person)" and must "remain[ ] in operation." *Id.* § 1675c(b)(1). Additionally, a producer that has "ceased the production of the product covered by the order or finding" is excluded from the statutory definition of "affected domestic producer." *Id.*

Plainly, Congress intended to distribute funds collected as a result of antidumping duty orders to more "affected domestic producers" than simply the petitioner who initiated the action. If Congress had intended to limit distributions to petitioners, the statute simply would have authorized distributions to "petitioners." There would be no need for an elaborate definition of "affected domestic producer," with its various requirements and exclusions. Congress's intent therefore must necessarily have been not to reward petitioners for assistance, but to provide a monetary remedy to injured members of the domestic injury, to offset the injuries caused by dumping. In fact, the very title of the Byrd Amendment—the Continued Dumping and Subsidy *Offset* Act of 2000—evinces to this purpose. *See also* 145 Cong. Rec. S497, 497 (1999) (statement of Sen. DeWine) ("Current law also does not contain a mechanism to help injured U.S. industries recover from the harmful effects of foreign dumping and subsidization."). It would be inconsistent with this intent to remedy the constitutional defects in the Byrd Amendment by limiting recovery to petitioners.

The second problem with Timken's approach is that it would not actually cure the First Amendment defect of the petition support requirement. Notably, Timken made its severance argument in the context of a finding by the Court of International Trade that the petition support requirement violated the Equal Protection Clause because it was not rationally related to a legitimate government purpose. While it might be true that limiting distributions to petitioners only—rather than petitioners and parties that supported the petition—might cure any problem that the petition support requirement had overcoming the rational basis test, the statute would still fail strict scrutiny under the First Amendment, even if severed as

Timken proposed, because it would still condition the receipt of funds on expression of a political viewpoint and petitioning activity—namely, filing a petition that argues that an antidumping duty order should enter. Moreover, the statute would still fail strict scrutiny, because less restrictive means are available to serve the interests identified by the majority (reward for assistance) and the government (remedy for the most seriously injured domestic producers). Thus, I would conclude that the Court of International Trade properly severed the Byrd Amendment by removing the petition support requirement.

### B. SKF's Cross Appeal

SKF argues on cross appeal that the Court of International Trade was wrong to hold that Customs was not required to accept SKF's amended certification for fiscal year 2005 distributions under the Byrd Amendment. Customs rejected SKF's amended certification as untimely. "[T]his court reviews the trial court's decision *de novo*, reapplying the same standard utilized by that court"—here, the standard of review under the Administrative Procedure Act. *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1004 (Fed.Cir.2003). Under the Administrative Procedure Act:

> The reviewing court shall—... hold unlawful and set aside agency action, findings, and conclusions found to be
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

> (D) without observance of procedure required by law; [or]
>
> (E) unsupported by substantial evidence....

5 U.S.C. § 706 (2006).

The timing of certifications pursuant to the Byrd Amendment is governed by Treasury regulations. "At least 90 days before the end of a fiscal year, Customs will publish in the Federal Register a notice of intention to distribute assessed duties received as the continued dumping and subsidy offset for that fiscal year." 19 C.F.R. § 159.62(a). That notice contains instructions for filing a certification to claim a distribution. *Id.* § 159.62(b)(2). "In order to obtain a distribution of the offset, each affected domestic producer must submit a certification ... that must be received *within 60 days* after the date of publication of the notice in the Federal Register, indicating that the affected domestic producer desires to receive a distribution. The certification must enumerate the qualifying expenditures incurred by the domestic producer since the issuance of an order or finding for which a distribution has not previously been made...." *Id.* § 159.63(a) (emphasis added).

SKF admits that the certification that it submitted within the sixty-day time frame contained expenditure data only for a one manufacturing facility. It did not seek to amend its certification until after the Court of International Trade held that the petition support requirement was unconstitutional. SKF admits that its amended certification was untimely, but argues in essence that submitting a complete certification would have been futile, because "it was a foregone conclusion that Customs would reject SKF['s] certification." Br. of Plaintiff–Cross Appellant SKF USA Inc.

at 67. It further argues that its failure to submit a complete certification was harmless.

I disagree. Plainly, SKF's certification was *not* futile, because the Court of International Trade, reviewing Customs's rejection of the certification, held that the Byrd Amendment was unconstitutional and, as a result, that Customs should not have rejected SKF's certification. If SKF believed when it filed its certification that its challenge to the constitutionality of the Byrd Amendment was worth consideration by Customs, the Court of International Trade, and this court, then SKF should have expended its own time and effort to provide a complete and timely certification for all of its expenses. I would affirm Customs's refusal to accept SKF's amended certification under the Administrative Procedure Act's standard of review.

* * *

For the foregoing reasons, I respectfully dissent.